[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No.  12-16103
_____

D.C. Docket No. 5:01-cv-00384-MTT

TRAVIS CLINTON HITTSON,

Petitioner – Appellee–Cross Appellant,

versus

GDCP WARDEN,

Respondent – Appellant–Cross Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(July 9, 2014)

Before CARNES, Chief Judge, TJOFLAT and WILSON, Circuit Judges.

TJOFLAT, Circuit Judge:

In April 1992, Travis Hittson and Edward Vollmer, who were enlisted men in the Navy, brutally killed, mutilated, and dismembered their shipmate Conway Utterbeck. Hittson confessed to the crime, and in February 1993 he was convicted of murder in the Superior Court of Houston County, Georgia. During the penalty phase of his trial,[1] Hittson tried to show that his co-defendant, Vollmer, had planned the murder and manipulated Hittson into helping him carry it out. This strategy fell short and the jury returned a unanimous death sentence, finding as an aggravating factor that the murder "was outrageously or wantonly vile, horrible, or inhuman." See O.C.G.A. § 17-10-30(b)(7).

After Hittson exhausted his direct appeal and collateral attack remedies in the Georgia courts, he petitioned the United States District Court for the Middle District of Georgia for a writ of habeas corpus pursuant 28 U.S.C. § 2254. In his petition, Hittson presented twenty separate claims for relief. Those relevant to this appeal concern the penalty phase of his trial: (1) The trial court erroneously allowed the State's psychologist to testify to statements made by Hittson during a court-ordered mental-health examination, in violation of Hittson's Fifth Amendment right against self-incrimination and Sixth Amendment right to the

---

[1] Georgia death-penalty cases proceed in two phases. If a defendant is found guilty of a capital offense during the guilt phase, then the case proceeds to the penalty phase, during which the same jury must unanimously find at least one statutory aggravating factor in order to return a death sentence. See O.C.G.A. §§ 17-10-2(c); 17-10-31(a).

2

effective assistance of counsel.[2] (2) Hittson's attorneys failed to properly present to the jury expert testimony regarding his background and mental condition, thus denying him his Sixth Amendment right to the effective assistance of counsel. And (3) the State withheld exculpatory evidence in violation of the Due Process Clause of the Fourteenth Amendment and the rule of Brady v. Maryland[3]—to wit, a Navy psychiatric report diagnosing Vollmer with severe Antisocial Personality Disorder, and two letters written by Vollmer from jail following his arrest, in which he discussed the murder.

The District Court found that Hittson was entitled to habeas relief from his death sentence based on the State psychologist's testimony. Hittson v. Humphrey, No. 5:01–cv–384 (MTT), 2012 WL 5497808, at *56 (M.D. Ga. Nov. 13, 2012). The court found that trial court's allowance of the psychologist's testimony denied Hittson his Fifth and Sixth Amendment rights under Estelle v. Smith, 451 U.S. 454, 101 S. Ct. 1866, 68 L. Ed. 2d 359 (1981),[4] and that the testimony had a "substantial and injurious effect" on the jury's death sentence and was therefore

---

[2] The Sixth Amendment right to counsel and the Fifth Amendment right against self-incrimination have been made applicable to the states through the Fourteenth Amendment's Due Process Clause. See Duncan v. Louisiana, 391 U.S. 145, 148, 88 S. Ct. 1444, 1447, 20 L. Ed. 2d 491 (1968).

[3] 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[4] More accurately, the District Court found, under § 2254(d)(1), that the Georgia Supreme Court unreasonably applied Estelle in concluding that the trial court's admission of the psychologist's testimony into evidence did not deny Hittson his Fifth and Sixth Amendment rights.

3

not harmless, see Brecht v. Abrahamson, 507 U.S. 619, 638, 113 S. Ct. 1710, 1722, 123 L. Ed. 2d 353 (1993).  The court denied the remainder of Hittson's claims for relief.

On appeal, the State now concedes that the trial court's admission of the psychologist's testimony violated Hittson's constitutional rights and does not appeal the District Court's ruling on this point—leaving only the question of whether the admission of the testimony was harmless error under Brecht.  Hittson also cross-appealed the District Court's denial of some of his penalty phase challenges.  The District Court granted Hittson a certificate of appealability ("COA") on his Brady claims, and we expanded the COA to include his ineffective-assistance-of-counsel claim—that counsel failed to present expert testimony relating to Hittson's background and mental condition.

We expanded the COA a second time after the Supreme Court decided Trevino v. Thaler, __ U.S. __, 133 S. Ct. 1911, 1852 L. Ed. 2d 1044 (2013)—by which point briefing was already underway in this appeal.  Trevino recognized certain circumstances in which a federal court may excuse a habeas petitioner's failure to properly raise his claims in state court.  __ U.S. at __, 133 S. Ct. at 1920–21; see also Martinez v. Ryan, __ U.S. __, 132 S. Ct. 1309, 1320–21, 182 L. Ed. 2d 272 (2012).  Before Trevino came down, Hittson sought leave from the District Court to add four new claims to his federal petition—claims that he had not raised

4

in any of his state proceedings.  The District Court denied the motion.  Because

Trevino has some bearing on the District Court's analysis, we expanded Hittson's

COA to decide:

> Whether Hittson should be allowed to amend his federal habeas
> petition to include claims of ineffective assistance of trial counsel
> which were previously defaulted through prior counsel in state habeas
> proceedings in light of the United States Supreme Court's ruling in
> Trevino v. Thaler . . . .

After reviewing the record and entertaining the parties' arguments in open

court, we (1) reverse the District Court's grant of habeas relief setting aside

Hittson's death sentence based on the State psychologist's testimony, (2) affirm the

District Court's denial of Hittson's Brady claims and ineffective-assistance-of-

counsel claim, and (3) hold that Trevino does not enable Hittson to raise new

claims that he failed to litigate in state court.

Part I of this opinion describes the crime, as presented to the jury in the

State's case in chief, and the law enforcement's investigation.  Part II covers

Hittson's 1993 trial, his direct appeal to the Georgia Supreme Court, and that

court's refusal to grant him habeas corpus relief.  Part III covers the § 2254

proceedings in the United States District Court and its granting of the writ setting

aside Hittson's death sentence.  Part IV explains the standard we apply under

§ 2254 in reviewing the Georgia courts' denial of Hittson's constitutional claims.

In parts V, VI, and VII, we review and dispose of those claims.  Part VIII explains

5

our reasons for concluding Hittson may not rely on Trevino to excuse his procedural default.  And we briefly conclude in part IX.

## I.

## A.

In the spring of 1992, Travis Hittson, Edward Vollmer, and Conway Utterbeck were stationed aboard the USS Forrestal, an aircraft carrier that was based in Pensacola, Florida, at the time.  They were all assigned to the electrical division of the engineering department.  Vollmer and Hittson were on the same work detail, and Vollmer was Hittson's Leading Petty Officer.  Utterbeck had a different assignment but worked in a similar capacity in the same area of the ship.

On Friday, April 3, 1992, Vollmer invited Hittson and Utterbeck to come with him to his parents' house in Warner Robins, Georgia, for the weekend.  His parents were out of town.  Apparently neither Hittson nor Utterbeck was aware that the other had also been invited until shortly before they left Pensacola.  The three men arrived at Vollmer's parents' house late Friday evening, but they did not have a key, so they spent the night in a storage shed behind the house.  On Saturday, April 4, a friend of Vollmer's parents came by to check on the house; finding Vollmer and the two others there, he gave them a key.  The three sailors spent most of the day on Saturday hanging around the house, but sometime Saturday evening, Hittson and Vollmer went out drinking.  They left Utterbeck at the house.

6

Early in the morning of Sunday, April 5, after several hours of drinking, Hittson and Vollmer headed back to the Vollmer residence. According to the statement later given by Hittson to law enforcement, he was very drunk by that time. On the drive back, Vollmer worked Hittson up by telling him that Utterbeck was "going to get us"—that Utterbeck was plotting to kill the two of them—so "we've got to get him" by killing him first. At some point—though it is not clear when—Vollmer told Hittson that Utterbeck had a hit list with Hittson's and Vollmer's names on it. When they pulled into the driveway, Vollmer put on a bulletproof vest and a long trench coat and grabbed a sawed-off shotgun and a .22 caliber handgun from his car. He gave Hittson an aluminum bat that was also in the car and told Hittson that Utterbeck was waiting for them inside the house and was planning to shoot them.[5] Vollmer instructed Hittson to go in first and "get him" and then "get him in the kitchen"—so they would not make a mess on the carpet.

When Hittson entered the house, he found Utterbeck asleep in a recliner in the living room. Hittson sneaked up on him and hit him in the head with the bat.

---

[5] While Vollmer's parents did have guns in their house, it has never been established whether Vollmer (whom Hittson described as "very paranoid") actually believed that Utterbeck was planning to kill them that night, or if Vollmer just told Hittson as much to get him to kill Utterbeck. There is no evidence in the record to indicate that Utterbeck harbored any particular ill will towards either Hittson or Vollmer, or that Utterbeck had any intention to do them harm that night. And, other than the crime itself, there is no evidence in the record to indicate that Vollmer or Hittson had a reason to kill Utterbeck.

Utterbeck woke up and jumped up out of the chair.  Hittson hit him in the head again, knocking him to the floor.  Utterbeck raised a hand to defend himself, so Hittson hit his hand with the bat and then hit him in the head a third time.  The third hit was apparently enough to subdue Utterbeck.  Hittson dragged him by his hands into the kitchen, where Vollmer was waiting.  Utterbeck was still conscious and asked Hittson, "what did I ever do to you?"  Vollmer gave Hittson the .22 pistol and stood on Utterbeck's hand to keep him from struggling.  Utterbeck screamed "no, no," and begged for his life, but Hittson shot him point blank in the forehead.  In his own words, "I had no emotion or nothing on my face.  I know I didn't.  I was cold and Vollmer steps on his hand and . . . handed me the gun, I shot him."

Hittson and Vollmer stripped Utterbeck's body, taking the $62 they found in his pockets.  They left the body in the kitchen and went to a nearby Waffle House to get something to eat.  Upon their return, Vollmer told Hittson that they had to dismember the body and clean up the house to conceal the crime.  They initially tried to cut up the body with a serrated steak knife from the kitchen, but then switched to a hacksaw from the tool shed out back.  They also found a piece of slate in the shed, which they placed under the body to avoid scratching up the kitchen floor.  Following Vollmer's directions, Hittson sawed off one of Utterbeck's hands and began working on sawing off his head, but got sick and had

8

to stop.  Vollmer finished sawing off the head, the other hand, and both feet.

Vollmer also skinned part of Utterbeck's arm and chest with a knife and a pair of

pliers.  The autopsy later showed that Utterbeck's buttocks and penis were partially

skinned and his testicles and rectum were removed.  Hittson denied performing the

sexual mutilation and stated that he had not seen Vollmer do it either.

After finishing their grisly task, Hittson and Vollmer wrapped Utterbeck's

torso and severed body parts in plastic bags and left them in the kitchen while they

drove to a nearby wooded area to dig a shallow grave.  As they were returning to

Vollmer's parents' house—around 10:30 on Sunday morning—they happened to

pull onto the highway in front of a local woman who was traveling in the same

direction.  The woman took notice of Vollmer's car, which had an out-of-state

license plate and was pulling off of a lightly traveled dirt road that led to an

undeveloped tract of land owned by a friend.  Suspicious, she wrote down the

license plate number and a description of the car, which she later turned over to the

Houston County Sheriff's Office after Utterbeck's torso was discovered on the

property two months later.

Hittson and Vollmer returned to Vollmer's parents' house and began

cleaning the blood off the kitchen floor and the living room carpet.  Vollmer's

sister-in-law (who lived nearby) came by around noon on Sunday, while they were

still cleaning.  Vollmer left with her to go grab a bite to eat, without ever letting her

9

inside the house.  While they were gone, Hittson kept cleaning.  When Vollmer

returned, he and Hittson drove back out to the grave to bury Utterbeck's torso and

then went back to the house to finish cleaning.  The family friend who had given

them the key came by Sunday evening to check on the house again.  Hittson had to

quickly hide Utterbeck's clothes and throw a blanket over a lingering blood spot in

the living room.  When the family friend asked where the third guy was, Vollmer

told him that Utterbeck was asleep in the back room.

Hittson and Vollmer finally finished cleaning up the house sometime

Sunday evening, and so they packed up and set out for Pensacola.  They put

Utterbeck's severed hands, head, and feet in the trunk of Vollmer's car, along with

a few other pieces of evidence, including Utterbeck's clothing, his identification

card, and the .22 shell casing.  They threw Utterbeck's clothing and ID card in a

dumpster close to Vollmer's parents' house.  Before leaving Warner Robins, they

stopped at Vollmer's sister-in-law's for about an hour to say goodbye.  As they

drove back to Pensacola, Vollmer tried to find a good place to dump the remaining

body parts, but apparently did not find a spot to his liking.

They made it back to Pensacola around 6 a.m. on Monday, April 6.  With

Utterbeck's body parts still in Vollmer's trunk, they drove onto the Navy base and

reported for duty aboard the Forrestal.  When they got off work that day, they

drove to a wooded area outside of Pensacola and buried the body parts in several

10

shallow holes. On their drive back into town, they scattered some remaining pieces of evidence in a few dumpsters.

## B.

When Utterbeck failed to report for roll call on Monday, April 6, the Navy took note of his unauthorized absence but did not further investigate until later that month, when Utterbeck's mother called his division commander to tell him that she had not heard from her son since the first weekend in April—when he had traveled to Warner Robins with two shipmates. Inquiries aboard the Forrestal led Navy personnel to Hittson and Vollmer. When questioned about Utterbeck's whereabouts, they confirmed that they had gone to Vollmer's parents' house over the April 3 weekend with Utterbeck, but they claimed that they dropped him off at a bar in Pensacola sometime in early morning hours of Monday, April 6. On April 27, 1992, the Naval Investigative Service issued a missing persons alert for Utterbeck, and on May 5 he was declared a Navy deserter.

On June 16, 1992, Utterbeck's torso was discovered by loggers who were clearing the wooded property near Vollmer's parents' house. The loggers called the Houston County Sheriff's Office, who unearthed the torso and sent it to the state crime lab in Atlanta. The autopsy did not reveal the victim's identity. Upon hearing about the dead body, the local woman, who had months earlier written down Vollmer's license plate, called the sheriff's office. The plate number she had

11

written down was off by one digit, so the Houston County officials were not able to immediately trace the car to Vollmer.

On June 23, 1992, after receiving no new leads on Utterbeck's whereabouts, Navy investigators broadcast a request to other law enforcement agencies for information regarding any unidentified bodies matching Utterbeck's general description. The Houston County Sheriff's Office responded the same day, informing the Navy that they had unearthed the remains of a white male matching Utterbeck's characteristics approximately two miles from Vollmer's parents' house, with a time of death estimated sometime in early April.

Investigators from Houston County and the Navy interviewed Hittson on June 25, 1992. Hittson initially stuck to his story—that he and Vollmer had dropped Utterbeck off at a bar sometime early Monday morning—but after being confronted with the investigators' suspicions that they had found Utterbeck's dismembered body, Hittson confessed that he and Vollmer had murdered Utterbeck and buried him there. In a taped statement given to the investigators— which was later played for the jury—Hittson described the murder, dismemberment, and disposal of the body parts in detail. After confessing, Hittson led investigators to the spot outside Pensacola where the remaining body parts were buried. He also told the investigators where to find the baseball bat, which he and Vollmer had stashed in the rafters of the shed at Vollmer's parents' house.

12

Hittson was then taken into custody by the Houston County Sheriff's Office. That same day, Vollmer was arrested in Houston County, at his parents' house.

The next day, investigators executed search warrants for Vollmer's car and his parents' house. They found traces of blood and .22 caliber ammunition in the trunk of Vollmer's car. They recovered the .22 pistol, the aluminum bat, the hacksaw, the piece of slate Hittson and Vollmer used during the dismembering, and other various pieces of evidence from the house, and they found traces of blood on the kitchen floor and baseboard.

## II.

## A.

A Houston County grand jury returned an indictment on June 30, 1992, charging Hittson and Vollmer with four counts: Count One, malice murder; Count Two, armed robbery; Count Three, aggravated assault; and Count Four, possession of a firearm during the commission of a crime. At arraignment, both defendants pled not guilty, and in September 1992, the Houston County District Attorney filed a notice of the State's intention to seek the death penalty. The cases against Hittson and Vollmer were severed; at a joint trial, Hittson's confession, which implicated Vollmer, would technically be introduced against Hittson only, but the

13

spillover effect would deny Vollmer a fair trial.[6]  The case against Hittson would

be tried first.

Hittson's trial began on February 25, 1993, in the Superior Court of Houston

County.  During the guilt phase, Hittson's recorded confession formed the

framework for the State's case, with various experts and lay witnesses confirming

the gory details Hittson related and a raft of gruesome autopsy photos showing

Utterbeck's partially-decomposed torso and severed head, hands, and feet.  The

State rested its case after three days, and Hittson did not put on a defense to contest

guilt.  On Saturday, February 27, 1993, the jury found Hittson guilty on all counts.[7]

The penalty phase of the trial began Monday, March 1.  Under Georgia law,

to sentence a convicted murderer to death, the jury must return a unanimous

verdict finding at least one statutorily defined aggravating factor.  See O.C.G.A.

§ 17-10-31(a).  The State, relying on the evidence presented in the guilt phase,

pointed to two such factors in support of a death sentence: the murder was

committed during the commission of an aggravated battery, see id. § 17-10-

30(b)(2), and the murder "was outrageously or wantonly vile, horrible, or inhuman

---

[6] At a joint trial, unless Hittson took the witness stand, which would be highly unlikely, Vollmer would be unable to examine him about his confession.  See generally Reeves v. State, 237 Ga. 1, 3, 226 S.E.2d 567, 568 (1976) ("[T]he admission of a co-defendant's confession that implicated another defendant at a joint trial constitutes prejudicial error . . . ." (citing Bruton v. United States, 391 U.S. 123, 126, 88 S. Ct. 1620, 1622, 20 L. Ed. 2d 476 (1968)).

[7] On Count Two, armed robbery, the jury found Hittson guilty of the lesser charge of theft by taking.

in that it involved torture, depravity of mind, or an aggravated battery to the victim," see id. § 17-10-30(b)(7).[8]  The State did not put on any new evidence during the penalty phase.

A Georgia jury must also consider mitigating factors in deciding whether to return a death sentence.  Id. § 17-10-30(b).  Even if the jury finds an aggravating factor, they may still return a life sentence, with no requirement that they explain their reasons for doing so.  Head v. Thomason, 276 Ga. 434, 436, 578 S.E.2d 426, 429 (2003).

Hittson's defense against a death sentence took a day and a half; it consisted of the testimony of twenty lay witnesses who either knew Hittson before he joined the Navy or worked with him or supervised him on the Forrestal.  The witnesses portrayed Hittson as a good-natured guy who, though somewhat dim-witted, was a hard worker and was eager to please.  His shipmates, some of whom shared an apartment with him in Pensacola, testified that Hittson drank frequently and heavily and would sometimes do stupid things when drunk.  The defense also elicited testimony that Hittson grew up in an unaffectionate home and was constantly in search of affirmation from others, he occasionally grew depressed

---

[8] The State initially proposed a third aggravating factor, that the murder was committed during the commission of another capital felony (the armed robbery).  However, because the jury found Hittson guilty of theft by taking instead of armed robbery, see note 7, supra, the trial court only instructed the jury on the two aggravating factors listed above.

15

because he thought no one could love him, and he would go to great lengths to be accepted by others.  Several of his shipmates testified that he was impressionable and gullible and would generally go along with whatever he thought people wanted from him.  His supervisors had similar assessments—e.g., "he was just a kid that needed some guidance and direction," and "he had a very fragile personality and he wanted to fit in."  Lt. Cornelius Mapp, Hittson's division officer, explained that "Hittson's the type of person that you can convince that he'd done anything."  In his assessment, Hittson wasn't capable of such a brutal murder—"If he's guilty, I think he's guilty of being in the presence of a crime and he didn't report it."

In contrast to painting Hittson as the easily-duped kid with a dependent personality, the defense sought to portray Vollmer as a violent sociopath who had plotted the murder and manipulated Hittson into helping him carry it out.  Several witnesses testified that Vollmer was intelligent and domineering; one shipmate explained that he "wanted people to think he was in control," and a friend of Vollmer's explained that he "liked to play with people's heads."  The defense submitted letters written by Vollmer that showed him to be arrogant and violent.[9]  Shipmates described Vollmer as a "violent guy" who "likes to hold a grudge" and

_____

[9] For example, Vollmer bragged about participating in gang fights, dealing drugs, and putting bounties out on rivals' heads; he called himself "King of the Knights of Death" and wrote, "I'm not afraid of dying and I have no problem with killing anyone . . . . Morals are for losers trying to justify their place in life."

16

was known to keep his bulletproof vest and aluminum bat in his car and occasionally carry a sawed-off shotgun under his trench coat.

The defense laid out evidence that Vollmer had been contemplating murder long before the April 3 weekend. On three or four occasions, Vollmer borrowed a shipmate's copy of a documentary describing forensic techniques used to detect and solve murders. He read books about murder. He told several people, both before and after the murder, that the best way to dispose of a body was to cut it up. In one of his letters, Vollmer described a detailed plan to murder the boyfriend of a woman he used to be romantically involved with.[10] Regarding Utterbeck, a few witnesses testified that Vollmer did not like him and, prior to the murder, had told shipmates who had disagreements with Utterbeck that he would "take care of" him for them. No one ever identified a concrete motive for either Vollmer or Hittson, but the inference the defense team wanted the jury to draw was that Vollmer had been thinking about killing someone for quite a while, and on that April weekend, Hittson "was led by Mr. Vollmer to do this out of some perverse or demented fantasy that Mr. Vollmer had entertained."[11]

---

[10] The plan laid out in the letter had no obvious similarities to Utterbeck's murder.

[11] Doc. 56-9, at 95 (testimony given by trial counsel during habeas proceedings before the Butts County Superior Court).

17

According to the defense's theory, it was no surprise that someone like Hittson would be vulnerable to manipulation by someone like Vollmer. The narrative they sought to create was "that basically away from the co-defendant, [Hittson] was a pretty harmless guy . . . he drank a lot, but, basically, he was sort of a needy kind of harmless little guy, and that Mr. Vollmer was the brains of this operation and basically manipulated [Hittson] into doing something that he would have never done."[12] One witness during the penalty phase described Hittson as Vollmer's "sidekick"—his "dog." In the words of another witness, "Vollmer was, you know, he liked to tell somebody what to do, and Hittson was the kind of guy, you know, if you're his friend and . . . you tell him something to do, he'll do it. So Vollmer had somebody to tell what to do and somebody to do it, and Hittson had somebody who . . . would tell him what to do."

To further distinguish Hittson from Vollmer, the defense presented testimony that, after that April weekend, their relationship deteriorated. Vollmer continued to be the "same old guy." He jokingly told his friends that he had killed Utterbeck and told shipmates that if they shot someone, to shoot them in the heart instead of the head, because head wounds bleed too much. In comparison, Hittson stopped hanging around Vollmer after the murder—they even got in a fight shortly

---

[12] Doc. 75-17, at 61–62 (testimony given by trial counsel during habeas proceedings before the Butts County Superior Court).

18

before they were arrested—and Hittson became withdrawn and depressed and began to drink even more.  One night after some heavy drinking, Hittson confessed to his best friend, Steven Nix, that Utterbeck "wasn't ever coming back."  When asked if Hittson appeared remorseful during this conversation, Nix responded, "[l]ooking back now, maybe, he might have been."

To rebut Nix's testimony that Hittson might have been remorseful, the State called Dr. Robert Storms, the psychologist the State had employed to examine Hittson prior to trial,[13] to testify to statements made by Hittson during the examination.  Prior to trial, the defense team had Hittson examined by a psychologist and psychiatrist and were considering using some of the experts' findings as mitigation evidence during the penalty phase.  To preserve their right to present this evidence, a few weeks before the trial began they filed a Notice of Intent of Defense to Raise Issue of Insanity or Mental Incompetence.  See Ga. Unif. Super. Ct. R. 31.4 (1993) (now Rule 31.5).  To allow the State to counter the defense experts' findings, the trial court granted the State's motion for an order requiring Hittson to submit to an examination by an expert of the State's choosing, Dr. Storms.  Hittson's attorneys were allowed to attend the examination, and

---

[13] Dr. Storms was the senior psychologist in the Forensic Services Division of the Central State Hospital in Milledgeville, Georgia.

Hittson signed a form waiving his <u>Miranda</u>[14] rights before talking to Dr. Storms.

During the interview, Hittson described Utterbeck as a "hillbilly" and an "asshole."

The defense team eventually decided not to put on any expert opinion testimony of

Hittson's mental condition; instead, they stuck to the lay testimony they had

already presented and rested their case.  Nonetheless, the State, in rebuttal,

proffered in camera the testimony Dr. Storms would give, as a "lay" witness, about

Hittson's description of Utterbeck—ostensibly to counter Nix's testimony that

Hittson was remorseful.  The defense team strenuously objected to the proffer on

the grounds that Hittson's waiver of his <u>Miranda</u> right against self-incrimination

was limited to the admission of Dr. Storms's opinion testimony to rebut the

defense experts' opinions.  The court overruled the objection, and Dr. Storms

testified before the jury in accordance with his proffer.

After stating his name, position, and reason for interviewing Hittson, Dr.

Storms testified as follows:

> Q      Now, in the course of . . . your interview with [Hittson] did you,
> at any time, ask him about his opinion, or to give some statement
> about Mr. Conway Utterbeck?
>
> A      Yes.  I wanted to find out about that relationship.

---

[14]  <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).  In signing the form, Hittson purported to waive his right to remain silent—his right against self-incrimination—during the examination.

20

Q      All right.  And if you would, please, state what this defendant said about Conway.

A      Well, at one point he stated that Mr. Utterbeck was a "hillbilly," and at another point he stated that he was an "asshole."

Hittson's attorneys did not cross examine Dr. Storms or present any evidence in surrebuttal.

In its closing argument to the jury, the State made reference to the "hillbilly" and "asshole" comments again:

[Y]ou've heard one of the defense witnesses talk about, well, as I think about it now he was remorseful.  I think he was remorseful. Well, members of the jury, there's your remorse.  (Referring to easel.)[15]  As early, or as late, rather, as three weeks ago this is this defendant's response when asked about Conway Utterbeck being an innocent human being.  Conway was a hillbilly, he was an asshole.  Is that remorse?  What does your common sense tell you?  What does reason tell you?

In the defense's closing argument, Hittson's attorney discounted the comments and sought to mitigate their impact by pointing out Hittson's cooperation with investigators—he confessed, led investigators to the body parts, and told them where to find the bat.  In other words, regardless of how Hittson described Utterbeck, he was clearly overcome with guilt about what he had done—

---

[15] The record does not indicate what was displayed on the easel, but one of Hittson's attorneys testified before the Butts County Superior Court, in a hearing on Hittson's petition for a writ of habeas corpus, that the District Attorney wrote "hillbilly" and "asshole" on "big poster boards" and displayed them to the jury during some portion of his closing argument.

21

why else would he have confessed and aided investigators in making the case against him?

The court charged the jury with their task—that, in considering whether to impose the death penalty, they unanimously find at least one aggravating factor to exist beyond a reasonable doubt. In explaining the requirements for finding that the murder was "outrageously or wantonly vile, horrible, or inhuman," the court instructed the jury that they must find that the murder involved either "[1] depravity of mind; or [2] torture of the victim prior to the death of the victim; or [3] aggravated battery to the victim prior to the death of the victim." See O.C.G.A. § 17-10-30(b)(7). The court further clarified that "[d]epravity of mind is a reflection of an utterly corrupt, perverted, or immoral state of mind," and in deciding whether the murder involved such a mindset, the jury could consider "the actions of the defendant prior to and after the commission of the murder," including whether the defendant "subjected the body of a deceased victim to mutilation."

The jury took all of the evidence from the guilt phase with them into deliberations, including a picture of Utterbeck before the murder; pictures of Utterbeck's mutilated torso and severed head, hands, and feet; autopsy photos showing the mutilation in great detail; and a diagram of Vollmer's parents' house indicating where Hittson hit Utterbeck with the bat, dragged him into the kitchen,

22

and where he was positioned when Hittson shot him.  The jury also had the defense's exhibits from the penalty phase, including the letters written by Vollmer, several pictures of Hittson with his family and as a child, and an art project Hittson made in school.

During deliberations, the jury sent the court two questions aimed at whether a "life sentence" actually meant that Hittson would spend the rest of his life in prison.  The court responded to both by repeating its original charge, that a life sentence meant Hittson would "serve the remainder of life in the penitentiary." After approximately four hours, the jury returned a unanimous death sentence. The aggravating circumstance they found was that the murder was "outrageously or wantonly vile, horrible, or inhuman, in that it involved depravity of mind."  The judge imposed Hittson's death sentence on March 17, 1993.

In October 1993, Vollmer pled guilty to the murder count in exchange for a life sentence.[16]  He is currently eligible for parole.

---

[16] The District Attorney who tried Hittson and offered Vollmer a plea deal explained his reasons for seeking the death penalty for Hittson, while offering Vollmer a plea, as follows:

[I]t was my impression that [Vollmer] was a manipulator and certainly an evil person. . . . The problem I had is, in deciding what to do I have to divorce my gut and my feelings from what the evidence is and what the law is.  I felt like, you know, for all his personality problems and his being evil, whatever you want to call it, it was Mr. Hittson who swung the bat and got Mr. Utterbeck basically groggy or dazed or semi-conscious, and it was Mr. Hittson who put the gun between his eyes and blew his brains out.  And so . . . from a factual standpoint, that's a stronger case.

B.

Hittson appealed his convictions and death sentence to the Georgia Supreme Court, asserting a raft of trial court errors; chief among them was the court's ruling that allowed Dr. Storms to testify in accordance with his proffer. Hittson's brief to the Supreme Court reiterated his objection at trial, arguing that, to the extent that he waived his privilege against self-incrimination when he signed the Miranda waiver form and submitted to the court-ordered examination, that waiver was limited to allowing the State to rebut defense expert testimony of his mental condition. Thus, when the trial court allowed Dr. Storms to testify as a lay witness to rebut Hittson's evidence of remorse, it went beyond the scope of the waiver and violated Hittson's Fifth Amendment right against compelled self-incrimination. Hittson also argued that, by ordering him to submit to Dr. Storms's examination without any notice that his statements could be used against him—even if he did not present expert testimony in his own defense—the trial court denied him any meaningful assistance of counsel in connection with the examination, in violation of the Sixth Amendment. Hittson relied on Estelle v. Smith, 451 U.S. 454, 101

---

The other things, they're more nebulous. They're more, you know, on some other plane they might mean a lot but when you start talking about facts and evidence and who did what, I had a great concern that the jury would, in the end would say, well [Vollmer] didn't pull the trigger, he didn't swing the bat, and so I felt at that point a bird in the hand.

Doc. 56-11, at 148–49.

24

S. Ct. 1866, 68 L. Ed. 2d 359 (1981), as the legal basis for both arguments.  For

convenience, we refer to the Fifth and Sixth Amendment violations based on Dr.

Storms's testimony as Hittson's "Estelle claims."

In October 1994, the Georgia Supreme Court upheld Hittson's convictions

and death sentence.  Hittson v. State, 264 Ga. 682, 449 S.E.2d 586 (1994), cert.

denied 514 U.S. 1129, 115 S. Ct. 2005, 131 L. Ed. 2d 1005 (1995).  In rejecting his

Fifth Amendment claim, the court explained that Hittson voluntarily waived his

privilege against self-incrimination when he signed the Miranda form prior to the

examination.  Id. at 684–85, 449 S.E.2d at 591–92.  And the court found no Sixth

Amendment violation because the trial court adequately instructed defense counsel

on the scope and nature of the examination and allowed them to observe it and

voice objections if necessary.  Id. at 685, 449 S.E.2d at 592.

## C.

In December 1995, Hittson petitioned the Superior Court of Butts County,

Georgia, for a writ of habeas corpus.  See O.C.G.A. § 9-14-42.  His petition

alleged ineffective assistance of counsel "at virtually every critical stage before and

during trial."  The ineffective-assistance claim before us in the immediate appeal—

that Hittson's trial counsel, in the penalty phase of his trial, failed to present

mitigating expert testimony regarding his background and mental condition—was

25

among the allegations.[17]  The petition also raised a "protective" Brady claim,

which generally alleged that the State withheld exculpatory evidence but did not

identify the evidence.  Hittson's petition did not include his Estelle claims—

because the Georgia Supreme Court rejected the claims on direct appeal, he was

precluded from raising them on collateral attack absent an intervening change in

the law.  See Bruce v. Smith, 274 Ga. 432, 434, 553 S.E.2d 808, 810 (2001).

The Superior Court held a two-day evidentiary hearing on Hittson's petition

in October 1997.  At the close of the hearing, the court denied Hittson's protective

Brady claim because he failed to come forward with any exculpatory evidence the

State had withheld at trial.  In an order issued in July 1998, the court shaped

Hittson's ineffective-assistance allegations into eight discrete claims and rejected

all of them under the standard set forth in Strickland v. Washington, 466 U.S. 668,

687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984).

In October 1998, Hittson applied to the Georgia Supreme Court for a

certificate of probable cause to appeal ("CPC"), pursuant to O.C.G.A. § 9-14-52.[18]

He took issue with the Superior Court's denial of five of his ineffective-assistance

---

[17]  We present the facts related to this claim and expound on the state courts' treatment of the claim in part VI, infra.

[18] Section 9-14-52(a) requires petitioners to obtain a certificate of probable cause before appealing an adverse decision in the superior court.  Rule 36 of the Georgia Supreme Court's Rules provides that a certificate of probable cause must be granted "where there is arguable merit."

claims.  Finding that his arguments lacked "arguable merit," the Georgia Supreme

Court denied the CPC in September 2000.  See Ga. Sup. Ct. R. 36.

While Hittson's CPC application was pending, the Georgia Supreme Court

decided Nance v. State, 272 Ga. 217, 526 S.E.2d 560 (2000), in which the court

explicitly overruled its decision in Hittson's direct appeal on the following point:

> [W]hen a defendant must submit to a court-ordered mental health
> examination because he wishes to present expert mental health
> testimony at his trial, the State expert may only testify in rebuttal to
> the testimony of the defense expert or to rebut the testimony of the
> defendant himself.
>
> . . .
>
> To the extent Hittson v. State authorized a State expert to testify in
> response to lay witness testimony that the defendant was remorseful,
> it is overruled.

Id. at 220, 220 n.2, 526 S.E.2d at 565, 565 n.2 (citations omitted).  Hittson did not

seek leave to amend his CPC application to ask the Georgia Supreme Court to

consider the effect of Nance on his Estelle claims (which he had not raised in the

Butts County Superior Court).  However, after the Supreme Court denied his CPC

application, Hittson filed a motion for reconsideration, asking the high court to

consider the Estelle claims in light of Nance.  The Supreme Court summarily

denied the motion in January 2001, and the United States Supreme Court denied

certiorari review in May 2001, Hittson v. Turpin, 532 U.S. 1052, 121 S. Ct. 2193,

149 L. Ed. 2d 1025 (2001).

27

III.

A.

In January 2002, Hittson petitioned the United States District Court for the Middle District of Georgia for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, setting aside his convictions and death sentence. The petition included most of the claims he presented to the Georgia Supreme Court on direct appeal and to the Butts County Superior Court in his habeas petition, including the Estelle claims, several ineffective-assistance claims, and the protective Brady claim. To allow Hittson to flesh out his Brady claim, the District Court ordered the State to turn over the District Attorney's file on the Utterbeck murder prosecution. When Hittson's habeas counsel reviewed the file, they discovered a 1991 Navy psychiatric report, which diagnosed Vollmer with Antisocial Personality Disorder, and two letters Vollmer had written from jail that touched on certain aspects of the murder. Because Hittson had not litigated Brady claims based on this evidence in the Butts County Superior Court, the District Court stayed further proceedings to allow Hittson to exhaust the newfound Brady claims in state court.

B.

Accordingly, in July 2005, Hittson returned to the Butts County Superior Court, filing a second habeas petition. The petition included two new Brady claims, one based on Vollmer's psychiatric report and the other on the post-arrest

28

letters he wrote from the jail.  Hittson also resubmitted his claim that the admission of Dr. Storms's lay testimony violated his Fifth Amendment right against self-incrimination.[19]  Under Georgia law, a state prisoner may only bring a successive habeas petition that raises claims "which could not reasonably have been raised in the original or amended petition."  O.C.G.A. § 9-14-51.  Hittson alleged that his new petition was his first opportunity to bring these claims because (a) he didn't have access to the Brady material until the federal district court ordered discovery of the District Attorney's file and (b) res judicata barred his Fifth Amendment claim at the time he prosecuted his first habeas petition—it was only after the Supreme Court in Nance overruled its decision rejecting his Fifth Amendment claim in his direct appeal that he was able to assert the claim in a habeas petition.

The Superior Court disagreed.  Without conducting an evidentiary hearing, the court held that all of Hittson's claims could have been presented while he was prosecuting his first habeas petition and were thus barred as successive.  The Georgia Supreme Court granted a certificate of probable cause to appeal from this decision, vacated the Superior Court's decision, and remanded the case with instructions that the court conduct an evidentiary hearing.

_____

[19]  Hittson's petition did not re-allege his claim that the trial court's order requiring him to submit to Dr. Storms's examination denied him his Sixth Amendment right to counsel.

29

With the benefit of a two-day hearing, the Superior Court again denied habeas relief, in January 2009.  In a somewhat convoluted opinion, the court rejected Hittson's Fifth Amendment claim on three separate grounds: (1) The claim was barred by res judicata because the Georgia Supreme Court rejected it on direct appeal, and even though Nance overruled that decision, Nance did not apply retroactively because "Nance did not set forth a new rule of constitutional dimension, but merely narrowed an existing rule of criminal procedure."  (2) The claim was barred by res judicata because, even if Nance applied retroactively, the Supreme Court denied Hittson's CPC application, and motion for reconsideration of that denial, after Nance was decided.  (3) Even if the Fifth Amendment claim was properly before the court, and even if the admission of Dr. Storms's testimony violated Hittson's privilege against self-incrimination, it was harmless error in light of the overwhelming evidence in support of the jury's death sentence.

The Superior Court rejected the Brady claims on alternative grounds too.  It held that the claim based on Vollmer's psychiatric report was procedurally defaulted because Hittson's trial counsel or the attorneys who represented him in his first habeas proceeding could have obtained the report from a source other than the Houston County District Attorney through the exercise of reasonable diligence and Hittson had not shown cause and resulting prejudice to excuse his failure to

30

raise the claim on direct appeal or in his first habeas petition.[20]  Even so, the court

held that both Brady claims failed on the merits because the Vollmer psychiatric

report and Vollmer's jailhouse letters were cumulative of the mitigation evidence

presented during the penalty phase and the evidence supporting a death sentence

was overwhelming; thus, even when considered cumulatively, the "withheld"

evidence did not create a reasonable probability of a different result.[21]

Hittson again sought a certificate of probable cause from the Georgia

Supreme Court.  He argued that (1) none of his claims could have been raised at

any point before he filed his second habeas petition; (2) that the allowance of Dr.

Storms's testimony violated his Fifth and Sixth Amendment rights and the error

was not harmless; and (3) that the suppressed Brady material, considered either

separately or cumulatively, created a reasonable probability that the jury would

have returned a life sentence.  The Georgia high court concluded that these

arguments lacked arguable merit and summarily denied Hittson's CPC application

in October 2010.  The United States Supreme Court denied certiorari review in

---

[20] Georgia's procedural default rules mimic the federal doctrine: "A claim that is subject to procedural default may nevertheless be considered in habeas corpus proceedings if the petitioner can satisfy the cause and prejudice test."  Perkins v. Hall, 288 Ga. 810, 822, 708 S.E.2d 335, 346 (2011).

[21] See Kyles v. Whitley, 514 U.S. 419, 433, 115 S. Ct. 1555, 1566, 131 L. Ed. 2d 490 (1995) (explaining that to prevail on a Brady claim, the petitioner must show a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" (quotation mark omitted)).

June 2011.  Hittson v. Humphrey, __ U.S. __, 131 S. Ct. 3038, 180 L. Ed. 2d 858 (2011).

C.

In July 2011, Hittson returned to the District Court and amended his habeas petition to include his now-exhausted Brady claims.  In November 2012, the District Court granted the writ, setting aside Hittson's death sentence based on his Estelle claims.  The court found that the trial court's admission of Dr. Storms's testimony violated Hittson's Fifth and Sixth Amendment rights and that the Georgia Supreme Court's decision on direct appeal (the decision Nance overruled) unreasonably applied Estelle and its progeny in concluding otherwise.  Hittson, 2012 WL 5497808, at *30–35.

The District Court then applied the harmless-error standard from Brecht v. Abrahamson, 507 U.S. 619, 637–38, 113 S. Ct. 1710, 1721–22, 123 L. Ed. 2d 353 (1993), and concluded that Dr. Storms's testimony had a "substantial and injurious effect" on the jury's death sentence deliberations.  Hittson, 2012 WL 5497808, at *37–40.  Accordingly, the court vacated Hittson's sentence and ordered that the State conduct a new penalty-phase proceeding or impose a lesser sentence.

The District Court denied the rest of Hittson's claims, but granted a COA for his Brady claims.  This court then expanded the COA to include one of his ineffective-assistance-of-counsel claims.

IV.

"We review de novo the grant or denial of a writ of habeas corpus by a district court." Muhammad v. Sec'y, Fla. Dep't of Corr., 733 F.3d 1065, 1071 (11th Cir. 2013). Thus, we review Hittson's Estelle claims, Brady claims, and ineffective-assistance claim using the standard established by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 214—the same standard the District Court used.

A.

Under AEDPA, if a petitioner's claims have been "adjudicated on the merits in State court," a federal court cannot grant habeas relief unless the state court's adjudication of the claims (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state-court decision is "contrary to" federal law if it either "applies a rule that contradicts the governing law set forth in [Supreme Court] cases"—e.g., by applying the wrong legal standard to a particular claim—or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court

33

and nevertheless arrives at a [different] result." Williams v. Taylor, 529 U.S. 362, 405–06, 120 S. Ct. 1495, 1519–20, 146 L. Ed. 2d 389 (2000).

A state-court decision is an "unreasonable application" of Supreme Court precedent if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Id. at 407–08, 120 S. Ct. at 1520. "[A]n unreasonable application of federal law is different from an incorrect application of federal law." Id. at 410, 120 S. Ct. at 1522. "[S]o long as fairminded jurists could disagree on the correctness of the state court's decision," a federal court cannot grant habeas relief. Harrington v. Richter, __ U.S. __, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011) (citation and quotation marks omitted).

Finally, "AEDPA instructs that, when a federal habeas petitioner challenges the factual basis for a prior state-court decision rejecting a claim, the federal court may overturn the state court's decision only if it was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Burt v. Titlow, __ U.S. __, 134 S. Ct. 10, 15, 187 L. Ed. 2d 348 (2013) (quoting 28 U.S.C. § 2254(d)(2)). In such cases, "[t]he prisoner bears the burden of rebutting the state court's factual findings 'by clear and convincing evidence.'" Id. (quoting 28 U.S.C. § 2254(e)(1)). Like the "unreasonable application" standard in § 2254(d)(1), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a

different conclusion in the first instance." Wood v. Allen, 558 U.S. 290, 301, 130 S. Ct. 841, 849, 175 L. Ed. 2d 738 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question . . . that does not suffice to supersede the [state] court's determination." Id. (alterations and quotation marks omitted).

B.

Thus, AEDPA requires that our analysis of Hittson's constitutional claims be grounded in the Georgia courts' adjudication of those claims. Because we are considering multiple claims that were addressed by multiple state courts, it is useful at the outset to explain which state-court decisions we look to for purposes of AEDPA review.

Section 2254(d) requires that we defer to the state court's adjudication of a petitioner's constitutional claims. As this court has observed, "the state court's 'adjudication on the merits,' which triggers our review under [§ 2254], is the same 'adjudication of the claim' that we review for its application of federal law. . . . Therefore, the highest state court decision reaching the merits of a habeas petitioner's claim is the relevant state court decision" we review under AEDPA. Newland v. Hall, 527 F.3d 1162, 1199 (11th Cir. 2008); see also Harris v. Reed, 489 U.S. 255, 263, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989) (instructing

35

federal courts to look to the "last state court rendering a judgment in the case" for the state court's reasons for rejecting a claim).

In Hittson's case, the last state court to pass on the merits of the relevant claims was the Georgia Supreme Court, when it summarily denied a certificate of probable cause to appeal from the Butts County Superior Court's denial of Hittson's first, and then second, habeas petition. See Newland, 527 F.3d at 1199. Because the denial of the right to appeal by the state's highest court does not always constitute an adjudication on the merits, we briefly describe Georgia's habeas appeals process to reveal why the Georgia Supreme Court's denial of a CPC in this case constituted an adjudication on the merits.

Georgia habeas petitioners are required to obtain a certificate of probable cause from the Georgia Supreme Court before appealing a superior court decision denying relief.[22]  O.C.G.A. § 9-14-52(b).  The standard for granting a CPC is set forth in Rule 36 of the Georgia Supreme Court Rules, which provides that "[a] certificate of probable cause to appeal a final judgment in a habeas corpus case involving a criminal conviction will be issued where there is arguable merit."  Ga.

---

[22] In Pope v. Rich, 358 F.3d 852 (11th Cir. 2004) (per curiam), we held that a Georgia prisoner who did not apply for a certificate of probable cause to appeal failed to exhaust his state-court remedies as required by § 2254(b)(1). Id. at 854; see also O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 1732, 144 L. Ed. 2d 1 (1999) ("[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.").

36

Sup. Ct. R. 36 (emphasis added); see also Sears v. Humphrey, 294 Ga. 117, 117, 751 S.E.2d 365, 368 (2013) (explaining that a CPC denial rests on the Supreme Court's conclusion that a claim lacks "arguable merit").  "In order for the Supreme Court to consider fully the request for a certificate," § 9-14-52(b) directs the superior court clerk to transfer the record and transcript of the proceedings below to the Supreme Court.  As the Supreme Court has explained, the purpose of transcribed evidentiary hearings in the superior courts is, at least in part, "to assist the parties in preparing and opposing the application for a certificate of probable cause to appeal" and "to assist the [Supreme] Court in considering the application." Edwards v. State, 288 Ga. 459, 460, 707 S.E.2d 335, 336 (2011).

Therefore, in denying Hittson's CPC applications to appeal the denial of his first and second habeas petitions, the Supreme Court was not exercising discretionary review akin a denial of a petition for certiorari review.  See generally Ga. Sup. Ct. R. 34.  Instead, the court was required to grant a CPC if it found arguable merit to any of the arguments in the application.[23]  In concluding that Hittson's claims lacked arguable merit, the Supreme Court had the benefit of the record from prior proceedings, the transcripts of the hearings held on his habeas

---

[23] Because Georgia prisoners are required to apply for a CPC before they have exhausted their state remedies, see note 22, supra, claims not in Hittson's CPC application are unexhausted.

petitions,[24] and briefing on the merits of his constitutional claims.  Such a standard

clearly constitutes an adjudication on the merits for AEDPA purposes.  See

Johnson v. Williams, __ U.S. __, 133 S. Ct. 1088, 1097, 185 L. Ed. 2d 105 (2013)

("A judgment is normally said to have been rendered on the merits only if it was

delivered after the court heard and evaluated the evidence and the parties'

substantive arguments." (alteration, emphasis, and quotation marks omitted)).

While the Georgia high court denied each CPC without explaining why it

found Hittson's arguments to be meritless, there is no AEDPA requirement that a

state court explain its reasons for rejecting a claim; "Section 2254(d) applies even

where there has been a summary denial."  Cullen v. Pinholster, __ U.S. __, 131

S. Ct. 1388, 1402, 179 L. Ed. 2d 557 (2011).  "When a federal claim has been

presented to a state court and the state court has denied relief, it may be presumed

that the state court adjudicated the claim on the merits in the absence of any

indication or state-law procedural principles to the contrary."  Richter, __ U.S. at

__, 131 S. Ct. at 784–85.  Our task in these situations is to review the record before

the Georgia Supreme Court to "determine what arguments or theories supported or,

---

[24] In fact, the Supreme Court granted Hittson's application for a CPC to appeal the Superior Court's first denial of his second habeas petition and remanded with instructions that the court conduct an evidentiary hearing.

as here, could have supported, the state court's decision."[25]  Id. at __, 131 S. Ct. at

786.  Hittson may only obtain federal habeas relief "by showing there was no

reasonable basis for the state court to deny relief."  Id. at __, 131 S. Ct. at 784.

With this standard in mind, we turn to Hittson's constitutional claims.

---

[25] Prior to Richter, this circuit applied the Supreme Court's pre-AEDPA decision, Ylst v. Nunnemaker, 501 U.S. 797, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991), to "look through" summary decisions by state appellate courts—reviewing, under § 2254(d), "the last reasoned decision" by a state court.  See McGahee v. Ala. Dep't of Corr., 560 F.3d 1252, 1261 n.12 (11th Cir. 2009); Powell v. Allen, 602 F.3d 1263, 1268 n.2 (11th Cir. 2010) ("When the last state court rendering judgment affirms without explanation, we presume that it rests on the reasons given in the last reasoned decision.").  In light of Richter's directive—"[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief," __ U.S. at __, 131 S. Ct. at 784—we explained that "state appellate court[s'] [summary] affirmances warrant deference under AEDPA because 'the summary nature of a state court's decision does not lessen the deference that it is due,'" Gill v. Mecusker, 633 F.3d 1272, 1288 (11th Cir. 2011) (quoting Wright v. Moore, 278 F.3d 1245, 1254 (11th Cir. 2002)).  Accordingly, we declined to "look through" a summary decision by a state appellate court and instead reviewed the record to see "whether the outcome of the state court proceedings permits a grant of habeas relief in this case." Id. (emphasis added); see also Jones v. GDCP Warden, No. 11-14774, slip op. at 23–24 (11th Cir. Apr. 24, 2014) ("Though the Georgia Supreme Court did not give reasons for its decision [to deny the petitioner's CPC application], '[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.'" (quoting Richter, __ U.S. at __, 131 S. Ct. at 784)).

While some decisions of this court have continued to apply Ylst to ascribe the reasoning of a lower court to the decisions of later state courts, see, e.g., Adkins v. Warden, Holman CF, 710 F.3d 1241, 1250 n.6 (11th Cir. 2013); Price v. Allen, 679 F.3d 1315, 1320 n.4 (11th Cir. 2012); Madison v. Comm'r, Ala. Dep't of Corr., 677 F.3d 1333, 1336 n.1 (11th Cir. 2012), we are bound to follow the earliest of our post-Richter decisions, which is Gill (decided a month after Richter), see Morrison v. Amway Corp., 323 F.3d 920, 929 (11th Cir. 2003) ("[W]hen circuit authority is in conflict, a panel should look to the line of authority containing the earliest case, because a decision of a prior panel cannot be overturned by a later panel.") (quotation marks and citation omitted).  Accordingly, we do not review the reasoning given in the Butts County Superior Court decision; rather, we review the decision of the Georgia Supreme Court, in accordance with Richter's instructions.

V.

We begin with the two Estelle claims.  The first Estelle claim is that

Hittson's Fifth Amendment right against self-incrimination was denied when the

trial court, over Hittson's objection, permitted Dr. Storms to testify before the jury

in conformance with his in camera proffer.  The second claim is that the trial court

deprived Hittson of any meaningful assistance of counsel when it ordered him to

submit to an examination by Dr. Storms after waiving his Miranda rights.  The

State now concedes the denial of Hittson's Fifth and Sixth Amendment rights and,

accordingly, does not challenge the District Court's conclusion, reached under

§ 2254(d)(1), that the Georgia Supreme Court unreasonably applied Estelle in

denying both claims.  But that does not end our inquiry.  We must decide whether

these violations, which yielded Dr. Storms's testimony, prejudiced Hittson's

defense in the penalty phase so to entitle Hittson to habeas relief.

A.

In § 2254 proceedings, federal courts must evaluate constitutional errors

under the harmless-error standard articulated in Brecht v. Abrahamson, 507 U.S.

619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993).[26]  As Brecht explained, "[federal]

---

[26] The District Court and the parties have devoted considerable attention to the fact that the Butts County Superior Court applied the Brecht harmless-error standard when it denied Hittson's second habeas petition.  Georgia habeas courts typically apply the more petitioner-friendly standard from Chapman v. California, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705

habeas petitioners may obtain plenary review of their constitutional claims, but

they are not entitled to habeas relief based on trial error unless they can establish

_____

(1967), which requires the State to show harmlessness beyond a reasonable doubt. See Horne v. State, 281 Ga. 799, 808, 642 S.E.2d 659, 667 (2007). But state (and federal) courts are only required to use Chapman on direct review. See Fry v. Pliler, 551 U.S. 112, 116, 127 S. Ct. 2321, 2325, 168 L. Ed. 2d 16 (2007). The Supreme Court has not established a harmless-error standard for state collateral review. Because we are not reviewing the reasoning announced by the Superior Court, we need not decide how to treat that court's (seemingly anomalous) application of Brecht. In his CPC application to the Georgia Supreme Court, Hittson argued that the Chapman standard applied, under Georgia law, and that the admission of Dr. Storms's testimony was not harmless beyond a reasonable doubt. In concluding that his application lacked arguable merit, the Supreme Court could have concluded either that Dr. Storms's testimony did not violate Hittson's constitutional rights, or that the error was harmless under Chapman.

Either way, we would apply the Brecht standard, because Brecht is an independent hurdle to obtaining relief under § 2254. See Mansfield v. Sec'y, Fla. Dep't of Corr., 679 F.3d 1301, 1307–08 (11th Cir. 2012); Fry, 551 U.S. at 119, 127 S. Ct at 2327 ("[Section 2254(d)] sets forth a precondition to the grant of habeas relief . . . not an entitlement to it."). Where a state court finds an error harmless under Chapman, a federal habeas court could conclude that the state court unreasonably applied Chapman's harmless-beyond-a-reasonable-doubt standard (which would allow the federal court to issue the writ under § 2254(d)(1)), but nonetheless deny the writ because the error did not cause "actual prejudice" under Brecht. See Fry, 551 U.S. at 119–20, 127 S. Ct. at 2327; Mansfield, 679 F.3d at 1307–08. Because Brecht's "actual prejudice" standard is more stringent than AEDPA review of the state court's Chapman determination, it "makes no sense to require formal application of both tests" because the Brecht standard "obviously subsumes" the "more liberal AEDPA/Chapman standard." Fry, 551 U.S. at 119–20, 127 S. Ct. at 2327. Accordingly, federal habeas courts apply Brecht both where the state court, in rejecting a constitutional claim, failed to recognize the error (and thus did not conduct its own harmless error review) and where the state court found harmless error under Chapman. Fry 551 U.S. at 121–22, 127 S. Ct. at 2328.

Even if we were faced with a state court decision applying Brecht, we still would have no need to decide how to treat that decision under AEDPA, because we conclude that Dr. Storms's testimony did not cause "actual prejudice" under our own application of Brecht. See Berghuis v. Thompkins, 560 U.S. 370, 390, 130 S. Ct. 2250, 2265, 176 L. Ed. 2d 1098 (2010) ("Courts can . . . deny writs of habeas corpus under § 2254 by engaging in de novo review when it is unclear whether AEDPA deference applies . . . ."); Mansfield, 679 F.3d at 1308 ("[A] federal habeas court may deny relief based solely on a determination that a federal constitutional error was harmless under the Brecht standard."); see also Hodges v. Fla. Att'y Gen., 506 F.3d 1337, 1343 (11th Cir. 2007) ("[I]f the state court did not apply the correct harmless error standard . . . federal habeas relief is still due to be denied if the constitutional error was harmless [under Brecht].").

41

that it resulted in 'actual prejudice.'" Id. at 637, 113 S. Ct. at 1722. To find "actual prejudice," a federal habeas court must conclude that the error "had substantial and injurious effect or influence in determining the jury's verdict." Id. (quoting Kotteakos v. United States, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253, 90 L. Ed. 1557 (1946)).

The District Court concluded that Dr. Storms's testimony had a "substantial and injurious effect" on the jury's deliberations over Hittson's sentence. We review this decision de novo; therefore, we review the record to determine if Dr. Storms's testimony had a "substantial or injurious effect" on the jury's deliberations. In conducting this review, "[t]he inquiry [is not] merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence." Kotteakos, 328 U.S. at 764–65, 66 S. Ct. at 1248. If there is "more than a reasonable possibility that the error contributed to the conviction or sentence," then the error is not harmless. Mansfield v. Sec'y, Fla. Dep't of Corr., 679 F.3d 1301, 1313 (11th Cir. 2012).

Because Georgia law requires a jury to unanimously find at least one statutorily defined aggravating factor to return a death sentence, O.C.G.A. § 17-10-31, "habeas relief is warranted in this case if we believe even one of the jurors who

42

voted in favor of the death penalty likely was substantially influenced" by the error, Duest v. Singletary, 997 F.2d 1336, 1339 (11th Cir. 1993) (per curiam).

Because the error in Hittson's trial resulted in the improper admission of evidence, we must measure the impact of Dr. Storms's testimony on the jury in light of the body of evidence before them at the time. See Kotteakos, 328 U.S. at 764, 66 S. Ct. at 1248 ("[Courts] must take account of what the error meant to [the jury], not singled out and standing alone, but in relation to all else that happened."). We analyze this impact by "looking at several factors, including 'the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, . . . and, of course, the overall strength of the prosecution's case.'" Mason v. Allen, 605 F.3d 1114, 1123–24 (11th Cir. 2010) (per curiam) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S. Ct. 1431, 1438, 89 L. Ed. 2d 674 (1986)).

## B.

We begin with the jury's sentence. The jury found, after deliberating for four hours, that Hittson should be sentenced to death on account of the "outrageously or wantonly vile, horrible, or inhuman" nature of the murder. See O.C.G.A. § 17-10-30(b)(7). The trial court instructed the jury that, in order to rely on this aggravating factor, it must find that the murder was both "outrageously or

43

wantonly vile, horrible, or inhuman" and that it involved "depravity of mind; or torture to the victim prior to the death of the victim; or aggravated battery to the victim prior to the death of the victim."  As the court explained it, "[d]epravity of mind is a reflection of an utterly corrupt, perverted, or immoral state of mind," and in evaluating Hittson's mindset, the jury could consider his actions "prior to and after the commission of the murder," including whether he "subjected the body of a deceased victim to mutilation."

It is abundantly clear that the jury could have relied on this aggravating factor in the absence of Dr. Storms's testimony.  The jury heard Hittson's taped confession, during which he calmly described his role in the murder: how he found Utterbeck (who, according to Vollmer, was planning to ambush them) asleep in the living room, hit Utterbeck in the head with a baseball bat three times, dragged him to the kitchen so as not to make a mess on the living room carpet, and shot him in the forehead while he begged for his life.  After stripping Utterbeck's corpse and leaving it to bleed out on the kitchen floor, Hittson and Vollmer left to grab a bite to eat.  Upon their return, they meticulously sawed off Utterbeck's head, hands, and feet, and at least one of them castrated him, skinned his penis and buttocks, and cut out his rectum.  They tossed Utterbeck's mutilated torso in a shallow grave, spent the better part of a day cleaning his blood off the interior of the house, and headed back to Pensacola with his severed head, hands, and feet in the trunk—

44

stopping off to say "bye" to Vollmer's sister-in-law on the way out of town.

Clearly, the crime itself justified the jury's conclusion that Hittson carried out an

"outrageously or wantonly vile, horrible, or inhuman" murder with "depravity of

mind."

While Brecht "does not require a showing that but for the error the jury

would have rendered a verdict in favor of the defendant," Duest, 997 F.2d at 1338,

the overwhelming amount of evidence that supports the aggravating factor found

by the jury—particularly the post-mortem dismemberment and mutilation, which

the court explicitly mentioned in its charge—convinces us that Dr. Storms's

testimony did not meaningfully influence the jury's reliance on the "vile, horrible,

and inhuman" aggravating factor.  See Mansfield, 679 F.3d at 1313 ("[T]he

erroneous admission of evidence is likely to be harmless under the Brecht standard

where there is significant corroborating evidence . . . .").

In reaching the opposite conclusion, the District Court explained:

> Dr. Storms' testimony that Hittson called Utterbeck an asshole and a
> hillbilly certainly helped the State prove depravity of mind.  The jury
> was instructed that they could consider Hittson's actions after the
> commission of the crime.  Dr. Storms' testimony was the only
> evidence that months after the crime, and with Vollmer completely
> out of the picture, Hittson possessed a "corrupt" or "immoral state of
> mind."

Hittson, 2012 WL 5497808, at *40.  We flatly reject the District Court's

conclusion that the jury found Hittson's statements to Dr. Storms, made long after

45

the crime, to be probative of the "vile, horrible, and inhuman" nature of the murder or his "utterly corrupt, perverted, or immoral" state of mind.  The trial court told the jury that, in evaluating Hittson's mindset during the murder, they should consider whether he committed aggravated battery, torture, or mutilation.[27]  The jury heard, from Hittson's own mouth, a detailed description of how he and Vollmer cut Utterbeck up and stuffed him into garbage bags, and the State paraded a raft of grisly photos before the jury to give life to Hittson's words.  In light of the trial court's instructions and the overwhelming evidence supporting the jury's aggravating factor, we do not believe that the jury, in faithfully executing their duty, gave any weight to Dr. Storms's testimony in concluding that Hittson carried out the "vile, horrible, and inhuman" murder with "depravity of mind."[28]

But the aggravating factor merely allowed the jury to return a death sentence.  They could have still sentenced Hittson to life imprisonment based on mitigating circumstances, and so we must also assess the effectiveness of Dr. Storms's testimony as a rebuttal of Hittson's mitigation evidence—the purpose for

---

[27] Likewise, in urging the jury to find "depravity of mind," the District Attorney explained, "you can consider the dismemberment, you can consider the decapitation, you can consider the fact that they went to the Waffle House, you can consider the fact that the body was strewn all over the place."  Doc. 74-11, at 6.

[28] "We presume that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." United States v. Olano, 507 U.S. 725, 740, 113 S. Ct. 1770, 1781, 123 L. Ed. 2d 508 (1993) (alteration and quotation marks omitted).

46

which it was admitted. Hittson claims that "Dr. Storms's testimony was absolutely devastating to Mr. Hittson's defense . . . that Mr. Hittson was remorseful, burdened and ashamed." Hittson Appellee Br. at 26–27. This argument overstates both the strength of the "remorse" evidence and the ability of Dr. Storms's testimony to rebut that evidence.

Over the course of two days and twenty witnesses, the only mention of remorse during the penalty phase came from Hittson's best friend on the Forrestal, Steven Nix. Nix testified that, when Hittson told him Utterbeck was never coming back, Hittson seemed "kind-of sad, kind-of down, kind-of depressed." Doc. 74-9, at 43. When asked if Hittson seemed remorseful, Nix responded, "Maybe. . . . Looking back now, maybe, he might have been. . . . I didn't notice it at the time." Id. at 48. The only other evidence of Hittson's remorse during trial came from one of the detectives who interviewed Hittson. He testified, during the guilt phase, that prior to confessing:

> I felt that [Hittson] had possibly been involved in something that he was not extremely proud of, something that he had been a part of that he might not have necessarily been the instigator of; and that there was a possibility that he had been at the wrong place at the wrong time; and that this was something that I wasn't real sure that he could, he could live with; that it might would be to his best interest to clear his conscience, to tell what really happened.

Doc. 74-4, at 63.

47

Hittson now attempts to convert these isolated, equivocal statements into "powerful mitigating evidence" that was subsequently "dismantle[d]" by Dr. Storms's testimony. Hittson Appellee Br. at 27, 30. As is evident, though, the defense had a weak case for remorse and, accordingly, did not spend much time developing it. Instead, they spent the two-day penalty phase trying to prove that Hittson had been overborne by the evil, controlling Vollmer.[29] Remorse was an afterthought to the main strategy, and so, even if Dr. Storms had dismantled their perfunctory attempts to show remorse, the impact of his testimony on the jury's death sentence deliberations still would not have amounted to much. Cf. Randolph v. McNeil, 590 F.3d 1273, 1277 (11th Cir. 2009) (per curiam) (rejecting a habeas

---

[29] In Hittson's first state habeas proceedings—in which Hittson's Estelle claims were not at issue—Steve Hollman (lead counsel at trial) engaged in the following colloquy with Hittson's habeas counsel:

Q    [I]n fact, your whole theory in mitigation, part of your theory in mitigation was, that Mr. Hittson was, in fact, remorseful; correct?

[objection overruled]

A    Well, I don't know that, you know, it seems to me that the point that we were trying to make was that Travis was, was a guy who was pretty impressionable, and that basically away from the co-defendant, he was a pretty harmless guy, that he was, you know, just that he drank a lot, but, basically, he was sort of a needy kind of harmless little guy, and that Mr. Vollmer was the brains of this operation and basically manipulated Travis into doing something that he would have never done. I don't know how much the notion of remorse played into the case in mitigation.

Doc. 75-17, at 61–62.

Likewise, Bill Shurling (appointed by the court to advise Hittson's two trial lawyers) characterized trial counsel's mitigation strategy as follows: "[T]hey were not trying to bring out remorse. What they were trying to do is . . . show this [crime] is out of character with this particular defendant . . . ." Doc. 75-18, at 113.

petitioner's argument that an isolated statement that he lacked remorse had a substantial effect on the jury's death sentence, where there was an abundance of evidence to support the aggravating factors relied on by the jury).

But Dr. Storms's testimony did not necessarily rebut the little evidence of remorse that the defense mustered. Certainly, Hittson's unflattering description of his victim was illustrative of his indiscretion (and perhaps his dim-wittedness that the defense witnesses testified to), but these bare statements did not convert Hittson into a "brazen, unrepentant man." See Hittson, 2012 WL 5497808, at *39. Put simply, Hittson could regard Utterbeck as a hillbilly and an asshole and could also regret murdering him.

Stripped of embellishment, Dr. Storms's testimony suggested that Hittson disliked Utterbeck. As damning as Hittson now tries to make it, we are skeptical as to whether this information was truly detrimental.[30] Certainly, evidence that Hittson called Utterbeck a hillbilly and an asshole after the murder seems prejudicial when considered in isolation. But, in context, if Hittson had been fond of Utterbeck, his willingness to murder him on command would have made Hittson more culpable, not less. Since the State never identified a concrete motive for the

---

[30] We do not doubt the reaction by one of Hittson's attorneys—"It was like getting hit in the head with a board. I mean, it was, it was just, it was like getting gutted." Doc. 56-10, at 24. While we understand the distress felt by an attorney when the jury hears evidence he tried to keep from them, that visceral response does not absolve this court of its duty to rationally assess the evidence in the full context of all that was said and done at trial.

murder, Hittson's statements at least provide some alternative (albeit a weak one) to the inference that the murder was nothing more than a senseless act of violence.

In fact, in this very appeal, Hittson maintains that his trial counsel failed to fulfill their Sixth Amendment duty because they didn't present expert testimony of his mental condition—testimony that, had it been put before the jury, would have allowed the State to call Dr. Storms in rebuttal. His state habeas counsel discounted trial counsel's "strategic" concerns with Dr. Storms's testimony as follows:

> Mr. Hollman's [(lead trial counsel)] concern over Dr. Storms' potential testimony . . . was exaggerated and unfounded. Mr. Hollman was not concerned about Dr. Storms' professional assessment of Mr. Hittson, but feared only that Dr. Storms would testify to remarks Mr. Hittson made during their pre-trial interview. During that interview, Mr. Hittson referred to the victim as a "hillbilly" and, at another point, an "asshole." However, given that Mr. Hittson had just been found guilty of a horrific murder, these offhand remarks hardly outweighed the benefits of introducing favorable psychological evidence.

Doc. 76-1, at 39 (citation omitted). We agree with the assertion underlying this argument; given that Hittson murdered, mutilated, and dismembered Utterbeck, the fact that he later called Utterbeck a "hillbilly" and an "asshole" was simply not that significant.

Therefore, we cannot say that the erroneous admission of Dr. Storms's testimony had a substantial effect on the jury's finding that Hittson committed an

"outrageously or wantonly vile, horrible, or inhuman" murder with "depravity of mind." We reverse the District Court's holding to the contrary.


VI.

Hittson's next claim is that he was denied his Sixth Amendment right to counsel because his trial team failed to put on expert testimony regarding his mental condition during the penalty phase of his trial.

To prevail on an ineffective assistance claim, a habeas petitioner must establish both that his counsel's performance was constitutionally deficient and that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). Under Strickland's performance prong, a petitioner must show that his attorneys' conduct "fell below an objective standard of reasonableness"—i.e., that it was not "reasonable[] under prevailing professional norms." Id. at 688, 144 S. Ct. at 2064–65. And under the prejudice prong, he must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 144 S. Ct. at 2068.

The Georgia Supreme Court rejected Hittson's ineffective-assistance claim. Hittson now argues that the court unreasonably applied Strickland. The District Court disagreed, and so do we.

51

A.

Hittson's trial team consisted of three court-appointed lawyers: Walter "Bo" Sammons, Steve Hollman, and William Shurling. Sammons was appointed first, in June 1992, and Hollman was appointed a few months later (the trial began in February 1993). At the time, neither had tried a death-penalty case through to verdict and sentencing, and so after the State indicated its intention to seek the death penalty (in September 1992), the trial court appointed Shurling, who had tried a handful of capital cases, to advise Sammons and Hollman. Shurling appeared in court and attended strategy sessions, but Sammons and Hollman did most of the work and had the final say on important decisions.[31]

Hittson's defense team had him evaluated twice by a psychologist and once by a neuropsychiatrist, and they had a social worker research and prepare a detailed analysis of his upbringing and family dynamics. Sammons and Hollman also interviewed a number of lay witnesses (many of whom testified during the penalty phase) and compiled various records from Hittson's adolescence and Naval service. They traveled to Hittson's hometown in Nebraska to interview family, friends, counselors, and teachers; Hollman traveled to Pensacola and Philadelphia to interview sailors aboard the Forrestal; and both lawyers spent dozens of hours talking to Hittson.

---

[31] As Hollman put it, "Mr. Shurling did virtually nothing." Doc. 75-17, at 28.

52

Because of what their experts found, Hittson's attorneys filed a notice of their intent to raise Hittson's mental condition at trial. In accordance with Georgia law, the trial court required Hittson to submit to an examination by the State's chosen expert and the court's expert. Hittson's trial team eventually decided not to put on their experts because they felt that the overall weight of the expert testimony would hurt Hittson. Hittson claims that this decision amounted to constitutionally-deficient conduct. We thus examine the attorneys' decision, starting with their efforts to develop mitigating expert testimony and then describing their ultimate decision not to use the fruits of their labor.

1.

In July 1992 (shortly after Sammons was appointed), Sammons successfully petitioned the trial court for funds to have Hittson examined by a psychologist. According to Sammons, "[w]e were hopeful that it would be determined that Travis was mentally retarded or that he had some sort of psychiatric condition that would truly render sympathy, you know, from the jury." Doc. 75-16, at 74. Sammons hired Dr. Michael Prewett, a clinical psychologist from Macon, Georgia. Dr. Prewett interviewed Hittson twice, in July 1992 and January 1993, and administered a battery of psychometric tests, including the then-current versions of the widely-used Wechsler Adult Intelligence Scale ("WAIS") and Minnesota

53

Multiphasic Personality Inventory ("MMPI").[32]  Dr. Prewett also reviewed

Hittson's school records, counseling records, and letters written by Hittson.  Dr.

Prewett did not prepare a report; he just discussed his findings with Sammons and

Hollman.

Based on interviews with Hittson, Dr. Prewett concluded that "he was a

serious alcoholic who suffered from alcoholic blackouts," and "engaged in very

aggressive behavior" when drinking.  Doc. 74-8, at 38; Doc. 72-5, at 7.  His father

was an alcoholic and his family was dysfunctional, and, as a result, so was Hittson.

He had a hard time maintaining stable relationships; in fact, "he really never had

anything resembling a meaningful relationship with anybody," including his

family.  Doc. 75-18, at 22.  At the same time, "he was so desperate to belong some

place, that the first person that was nice to him he was going to kind of fall in

with."  Id. at 24–25.  Hittson had also contemplated suicide as an adolescent.

Dr. Prewett pegged Hittson's IQ at 86—in the low-average range of

intelligence.  His MMPI test results suggested a number of possible diagnoses:

depression, schizophrenia, schizoid personality disorder, schizo-typical personality

---

[32] Dr. Prewett also administered the Personal Problems Checklist, Wide Range
Achievement Test, Luria-Nebraska Neuropsychological Test Battery, Trail Making Test, and
Bender–Gestalt Test.

disorder, and borderline personality disorder.[33]  Of those possibilities, Dr. Prewett

believed that Borderline Personality Disorder was the correct diagnosis—based on

Hittson's history of unstable interpersonal relationships, substance abuse, suicidal

ideation, difficulty controlling his anger, and efforts to avoid abandonment.[34]

On account of this diagnosis, Dr. Prewett believed that it was possible that

Hittson could have experienced brief psychotic episodes, triggered by extreme

stress.  As he explained to the state habeas court:

> Individuals with severe characterlogical disturbance, when they are
> under stress, their behavior will frequently deteriorate to the point that
> for a brief period of time, they may, in fact, be out of touch with
> reality or have very poor reality testing.  He was capable of doing that,
> and perhaps had done that on at least one or two occasions.

Doc. 75-18, at 26.  Dr. Prewett could not determine whether Hittson had

experienced a psychotic episode on the night of the crime:

> [H]e was severely intoxicated on the night of the incident.  That
> would have masked anything that was going on, so it would have been
> impossible to make any determination of what was happening at that
> particular moment and time.

Id.

---

[33] The MMPI consists of several hundred true-false questions, which are then "scored" by a computer (the questions are statistically correlated to certain psychological traits).  The disorders listed above are correlated to Hittson's raw score; however, the results are subject to interpretation, which is why an expert (in this case, Dr. Prewett) is needed to reach a diagnosis.

[34] These characteristics tracked the entry for Borderline Personality Disorder in the then-current edition of the DSM, which Dr. Prewett relied on in making his diagnosis.  See Am. Psych. Ass'n, Diagnostic and Statistical Manual of Mental Disorders, at 346–47 (3d ed., rev. 1987) (hereinafter "DSM-III-R").

With respect to the crime, Hittson "expressed a good deal of remorse and disbelief that he could have done something like this." Id. Prior to the murder, he was not particularly close to Utterbeck, nor did he harbor any ill will towards him—they had a "neutral relationship." But Hittson had a "very strange relationship" with Vollmer; he "felt controlled by this individual [and] alternated between very intense hatred for this person versus almost hero worship at times." Id. at 22.

Dr. Prewett also believed that Hittson might have "some degree" of brain damage—possibly the result of a mild concussion or Hittson's alcohol abuse. Dr. Prewett suggested that Hittson's attorneys hire Dr. Norman Moore, a neuropsychiatrist who also practiced in Macon, to further evaluate Hittson—in particular, to evaluate the existence or extent of his brain damage. Hittson's trial team again successfully petitioned the court for funds, and in January 1993, Dr. Moore examined Hittson.

Dr. Moore did not find any evidence of brain damage, but he nonetheless prepared a detailed report of his observations. The report recounted Hittson's troubled childhood, including suicide attempts, heavy drinking, an alcoholic father,

56

and a dysfunctional family life.[35]  Dr. Moore observed that Hittson "has a quick temper but cools down quickly," and "does not get violent when sober but was always hostile and very violent on alcohol, especially liquor."  Doc. 75-20, at 39.  Dr. Moore also noted past misbehavior by Hittson, including stealing $1500 from his father and a burglary arrest while enlisted in the Navy.

Aboard the Forrestal, Hittson said that he tried to avoid working with Vollmer because Vollmer played "mind games."  Vollmer was higher in rank, though, and apparently hand-picked Hittson to be a part of his work crew.  Hittson said that Vollmer would try to "get him drunk, and as a test, take him out to pick up a hooker and use an electric zapper on her," but Hittson refused.  Id. at 38.  On the night of the murder, Hittson claimed that Vollmer "filled him with alcohol" before he told him that Utterbeck was going to kill them.  Id.  While he did not deny his participation in the murder, Hittson expressed disbelief at how he could have done the things he did.  When discussing his findings with the attorneys, Dr. Moore stated his belief that the crime had homosexual overtones, although he did not think that Hittson was a homosexual, and he characterized Hittson as "just mean" and told his attorneys that he would say as much if called to testify.  Doc. 75-16, at 100, 124.

---

[35] Dr. Moore's evaluation was based solely on his interview with Hittson.  Dr. Moore noted in his report, though, that "he impressed me with his openness and frankness and I have no reason to doubt the truthfulness of his statements."  Doc. 75-20, at 39–40.

Dr. Moore did not administer any psychometric tests; however, based on the interview, he diagnosed Hittson with alcoholism and Antisocial Personality Disorder. He also opined that Hittson "may have" experienced Induced Psychotic Disorder on the night of the murder. As Dr. Moore explained it:

> The central feature of this disorder is a delusional system that develops in a second person (Mr. Hittson) as a result of a close relationship with another person (the primary case, Mr. Vollmer) who already has a psychotic disorder with delusions. The same delusions are partly shared by both persons. The content of the delusion is usually within the realm of possibility, and is often based on common past experiences of the two people. Usually the primary person (Mr. Vollmer) with the psychotic disorder is the dominant one in the relationship and gradually imposes his or her delusional system on the more passive and initially healthy second person (Mr. Hittson).

Doc. 75-20, at 40. Dr. Moore pointed out that, for Hittson to have shared Vollmer's psychotic delusion on the night of the murder, Vollmer himself would have had to have had a psychotic delusion that Utterbeck intended to kill the two of them—something that Dr. Moore had no way of determining. Nonetheless, Dr. Moore noted that "[e]ven if Mr. Vollmer's belief did not reach delusional level, many of the other criteria were present," and so, it was his opinion "that Mr. Hittson was unduly influenced by Mr. Vollmer." Id.

Finally, in early February 1993, defense counsel obtained funds from the court to hire a social worker, Mary Shults, to work up a profile of Hittson's family. Shults traveled to Nebraska to interview family, friends, and teachers; she

58

interviewed Hittson in jail; and she reviewed some of the same records provided to Dr. Prewett.

Her research confirmed much of Hittson's account of his upbringing.  There was a history of alcohol abuse on both sides of Hittson's family; Hittson's father was an alcoholic who had emotionally abused Hittson when he was drunk; Hittson's three siblings struggled with alcohol dependency; and Hittson himself began drinking at a very young age—when he was a teenager, he was twice referred to treatment but never went.  The Hittson home had been a "chaotic environment" to grow up in.  When Shults visited, the house was in disrepair, the inside was "extremely cluttered, in disarray, and dirty," and family members "looked rather unkempt."  Doc. 75-20, at 6.  Shults believed that Hittson's parents "failed to provide clean appropriate clothing for themselves and their children, had poor hygiene skills, and failed to teach their children cleanliness and good hygiene."  Id. at 9–10.  Family dynamics paralleled living conditions—as Shults put it, "Hittson's family can only be described as dysfunctional."  Id. at 9.  Shults believed Hittson's parents to be emotionally neglectful; they "were very ineffective in providing nurturing and love for any of their children, but they neglected Travis even more than the rest."  Id. at 10.  Because of the lack of affection at home, Hittson spent a lot of time at a friend's house and became very attached to his

59

friend's family—he even took to calling the friend's mother "mom."[36] At school,
Hittson was "extremely needy, both emotionally and academically"; not
surprisingly, he performed poorly and was thought to have a learning disability.
Id. at 8. And he was teased by other children because he had poor hygiene and
dressed "awkwardly and clumsily" in "outdated and often dirty clothing." Id.

In Shults's opinion, Hittson's upbringing "hampered . . . his ability to form
appropriate relationships and interact appropriately with society" and led him to
"develop[] a pattern of seeking . . . attention and love from others." Id. at 10, 11.
Neither Shults nor Hittson's attorneys believed that this information would excuse
Hittson's participation in the murder, but they hoped it would at least explain
"some of the forces that went to mold Travis Hittson" and possibly show "how he
might be a bit more vulnerable . . . to being overwhelmed by the will of Mr.
Vollmer." Doc. 75-17, at 46.

2.

On February 5, 1993, the defense team filed a notice of their intent to use
Hittson's insanity or mental incompetence as a defense—as required if they wanted
the option of using any of their experts at trial. See Ga. Unif. Super. Ct. R. 31.4
(1993) (now Rule 31.5). In response, the State sought discovery of any expert

---

[36] Mrs. Evie Fletcher—the friend's mother—testified to this during the penalty phase of
Hittson's trial.

reports and requested that its own expert be allowed to evaluate Hittson. On February 11, 1993, the trial court ordered him to submit to an examination by Dr. Storms, the psychologist the State employed.[37] The court also appointed its own expert, Dr. Paul Coplin, to examine Hittson, pursuant to O.C.G.A. § 17-7-130.1.[38] Hittson's trial counsel were permitted to attend both examinations, but the court cautioned them not to disrupt the interviews, else they would lose the right to present their own experts. The court also stated that both sides could talk to Dr. Coplin before trial.

Drs. Storms and Coplin independently interviewed Hittson over the course of the next few days.[39] Sammons attended most of Dr. Storms's interview—he observed and took notes but did not interfere—but none of Hittson's attorneys attended Dr. Coplin's interview. In addition to interviewing Hittson, both doctors administered a handful of psychometric tests (including the WAIS and MMPI) and

---

[37] See generally Motes v. State, 256 Ga. 831, 832, 353 S.E.2d 348, 349 (1987) ("[I]f a defendant wants to tell his story to a jury through the mouth of an expert, the state should have an equal opportunity to tell that story through the mouth of an expert, and . . . the state could not practically possess this opportunity unless their expert gained access to the defendant.").

[38] "When notice of an insanity defense is filed, the court shall appoint at least one psychiatrist or licensed psychologist to examine the defendant and to testify at the trial." O.C.G.A. § 17-7-130.1.

[39] Dr. Coplin interviewed Hittson on Friday, February 12; Dr. Storms interviewed him on Saturday, February 13 and Sunday, February 14. Jury selection for Hittson's trial (which commenced on February 25) began on Tuesday, February 16.

61

reviewed some limited information on Hittson's background and the crime.[40]  They

each prepared a report stating their findings.

The reports contained much of the same background information.  Hittson

did not have a close relationship with his parents; his father was an alcoholic; he

started drinking in high school; and he had contemplated suicide.  Dr. Storms

reported that Hittson was "somewhat vague concerning his relationship with Mr.

Vollmer" but at one point stated that "Vollmer 'considered me to be his protégé.'"

Doc. 70-4, at 18.  Dr. Storms's report included Hittson's characterization of

Utterbeck—as a "hillbilly" and an "asshole"—but noted that "there was no

apparent intense feeling one way or the other between Mr. Hittson and his alleged

victim."  Id.  Dr. Storms did not find any motive for the murder, other than

Vollmer's statements telling Hittson that Utterbeck was going to kill them.  When

he asked Hittson how he felt just before he killed Utterbeck, Hittson indicated "that

he was afraid" and "that he was not thinking."  Id. at 21.

Dr. Storms scored Hittson's IQ at 105, placing him squarely in the average

range, and he found no evidence of brain damage.  Dr. Storms noted that the

MMPI scores indicated that "Hittson was attempting to unconsciously exaggerate

---

[40] Dr. Storms administered the WAIS, MMPI, Rorschach Inkblot Test, and Trail Making
Test.  Dr. Coplin administered the WAIS, MMPI, Bender–Gestalt Test, Adult Sentence
Completion Test, Draw-A-Person Human Figure Drawing Test, and Beck Depression Inventory.

his psychological problems,"[41] but he nonetheless believed that the test results fit

with his impressions from the interview:

> [Hittson] has basically led a passive-dependent life style overlayed on mild depression.  He seemingly has been one to unquestioningly go along with others who are perceived to have more personal power than he, however, he has, at times, acted out, especially when he has been drinking.
>
> . . .
>
> He tends to solve problems by "trial and error" and tends to not think through the ramifications of his actions before he acts. . . . .  He usually has enough psychological resources to control and direct his actions; however, under extraordinary circumstances, his controls may falter.

Id. at 20–21.  Dr. Storms did not find anything that would have impaired Hittson's

ability to distinguish right from wrong on the night of the murder.  He noted that

Hittson was drunk that night, and opined that alcohol tends to exacerbate Hittson's

"natural style" of "act[ing] before he thinks."  Id. at 21.

Like Dr. Storms, Dr. Coplin found Hittson's IQ to be average (93) and did

not find evidence of brain damage.  Dr. Coplin's test results showed Hittson to be

passive-dependent, depressed, anxious, and intrapunitive ("blaming himself for all

problems in his life situation").  Hittson had elevated MMPI scores on several

---

[41] The MMPI has built-in validity tests in the form of questions that are designed to ferret out individuals who may be trying to exaggerate or minimize their problems.

scales[42]—including the "Psychopathic Deviant" scale[43]—but Dr. Coplin did not

diagnose him with any personality disorders or otherwise find "any psychiatric

symptoms or psychiatric history that would render him not responsible for the

charges against him." Doc. 70-5, at 16. He did note that Hittson was probably an

alcoholic.

---

[42] The true–false answers given in response to MMPI questions correlate to numerical scores on one or more of ten MMPI clinical scales. Elevated scores on a given scale, or combinations of scores, are statistically correlated to certain personality traits or personality disorders. The psychometrician who analyzed Hittson's MMPI scores (as part of Dr. Coplin's examination) described Hittson's score profile as follows:

> [H]e tends to be anxious, tense and jumpy. He worries excessively and is vulnerable to real and imagined threat[s]. He may anticipate problems before they occur and over-react to minor stress. Somatic symptoms are common, involve vague complaints of fatigue, tiredness, bored[om], insomnia, and other physiological features. Depression is evident. He may not report feeling especially sad or happy but shows symptoms of clinical depression including slow personal tempo, slowed speech, and retarded thought processes. He is pessimistic about the world in general and more specifically about the likelihood of overcoming his problems. He may broo[d] and ruminate about his problems much of the time. Although he has a strong need for achievement and recognition for accomplishments, he feels guilty when he falls short of his goals. He tends to be rather indecisive and harbors feelings of inadequacy, insecurity, and inferiority. He is intrapunitive, blaming himself for all problems in his life situation. He is rigid in his thinking and problem solving and meticulous and perfectionistic in daily activities. He tends to be rather passive-dependent in his relationships with other people. He has the capacity for forming deep emotional ties and in times of stress may become overly clinging and dependent. He tends to elicit nurturance and helping behavior from others.

Doc. 70-5, at 14.

[43] Sammons later testified in the state habeas proceedings that Hittson's elevated Psychopathic Deviant score worried him, but neither party presented evidence in the state court to explain what an elevated Psychopathic Deviant score is understood to mean. Cf. Cullen v. Pinholster, __ U.S. __, 131 S. Ct. 1388, 1398, 179 L. Ed. 2d 557 (2011). ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.").

These findings remained unknown to the defense team when the guilt phase of the trial began on February 25, 1993.  The court did not require the parties to disclose their experts' findings before trial, and the court did not disclose Dr. Coplin's findings, because the defense had yet to definitively commit to putting on evidence of Hittson's mental condition.  While Sammons had attended Dr. Storms's interview, he was not privy to Dr. Storms's professional opinion.  None of Hittson's attorneys attended Dr. Coplin's interview or tried to talk to Dr. Coplin before trial.

The defense team waited to commit to a course of action until the start of the penalty phase—when they could wait no longer.  Following the parties' opening statements, they proffered Dr. Prewett's testimony to see if the court would let him testify to some of his findings without opening the door to the State's introduction of Drs. Coplin and Storms.

They did not present anything from Dr. Moore; in fact, it appears that the State was never aware of Dr. Moore's involvement.  Later, during the state habeas proceedings, Sammons explained his fear "that [Dr. Moore] would testify that Travis was just mean, and that he just did this because he is mean."  Doc. 75-16, at 101.  Apparently, after talking to Dr. Moore, Sammons did not think they should put on any mental health evidence: "I was scared to death that Dr. Moore's testimony would come in, that Dr. Prewett would testify that he had a consultation

65

with Dr. Moore, and that Dr. Moore would have been called, and he was our psychiatrist, and he would have testified that Travis was just mean." Id. at 102. "I didn't think that there was anything worth doing to take the risk of putting, of having the State put our psychiatrist on the stand to testify that our client was just mean." Id. at 103. While Hollman was less troubled by Dr. Moore's possible testimony (which presumably explains why they still proffered Dr. Prewett's testimony), he still felt that Dr. Moore's findings were not very helpful to their mitigation theory, and he wanted to avoid having Dr. Moore testify before the jury, if possible.

After Dr. Prewett gave a condensed version of his testimony outside the jury's presence, Hittson's counsel engaged in a lengthy colloquy with the court and District Attorney regarding their ability to present some or all of Dr. Prewett's findings without allowing rebuttal from Drs. Storms or Coplin (even though they were not yet aware of either doctor's findings). The court rejected their arguments and made it clear that, if they called Dr. Prewett, the State could call Drs. Storms or Coplin. Before forcing them to decide what course to pursue, the court gave both sides Dr. Coplin's report—cautioning Hittson's attorneys that, "I don't think y'all are going to find that that's going to be for the benefit of Mr. Hittson." Doc. 74-8, at 47. And the court required the State to turn over Dr. Storms's report. Trial counsel then had a thirty-minute recess to review the reports—Dr. Prewett

66

was still present and also read the reports, but did not recall having an in-depth discussion with the attorneys.

Upon seeing the doctors' findings, Sammons and Hollman were convinced that whatever benefit they might gain from having Dr. Prewett testify would be outweighed by the other experts' findings. In particular, Sammons recalled being worried about Dr. Coplin's MMPI test results showing Hittson to have an elevated Psychopathic Deviant score. In his words, "I felt like if the jury heard that—you know, you look at the photographs, you look at the crime, the jury hears that he is elevated on a scale for being a psychopathic deviant, you know, it was my feeling that that is what they would remember." Doc. 75-17, at 14. Sammons was also worried because Dr. Coplin did not find any evidence of brain damage—which conflicted with Dr. Prewett's findings (of the four doctors that examined Hittson, Dr. Prewett was the only one that found any indication of brain damage). Hollman likewise felt that the balance of the psychological testimony would not benefit Hittson: "we were very concerned that the State and the Court's, that is Dr. Storms['s] and Dr. Coplin's opinions of Mr. Hittson's mental state would have been very difficult for us to overcome and would have been potentially even frightening to the jury." Id. at 67.

Shurling was more ambivalent; he testified in the state habeas proceedings that, "[a]s a general proposition, I think one could say that all of the psychologies

67

and psychological evaluations taken together were very, well, they were unfavorable." Doc. 75-18, at 91. But later he stated that, had it been his call, he might have risked the rebuttal testimony because, in his experience, he preferred to put on all the evidence he has at his disposal and let the jury sort it out. Shurling was not the primary decisionmaker, though, and notwithstanding his inclination to put on all available evidence, he apparently did not object to Sammons's and Hollman's decision to forego expert testimony.

Following their review of the expert reports, trial counsel proffered Shults's testimony—again to see if they could have her testify without triggering rebuttal from Drs. Storms or Coplin. They again struck out. The court made it clear that if they put on Shults, then the State could call its own mental health experts to not only rebut Shults's testimony, but also to state their own conclusions based on their independent evaluation of Hittson.

Faced with an all-or-nothing proposition, the defense decided to forego expert testimony and just stick with their lay witnesses. In an abundance of caution, they even asked the court, "[i]f we put up lay witnesses to testify about [Hittson's] character, you won't let them put up Coplin and Storms?" To which the court replied "Right." Doc. 74-8, at 77. As recounted earlier, the defense team's twenty lay witnesses testified that Hittson was a pretty good guy—he was not the brightest and he drank a lot, but he was pretty much harmless—and that

68

Hittson was particularly impressionable and emotionally needy. And, as discussed in detail, one lay witness testified that Hittson "might have been" remorseful about the murder, which led to Dr. Storms's "lay" testimony that Hittson called Utterbeck a "hillbilly" and an "asshole" during his interview.

Following Dr. Storms's brief rebuttal testimony, Hittson's trial team did not try to re-open their case in chief to put on their experts, despite the fact that at least some of the testimony they had hoped to keep from the jury had now slipped out. When asked why Dr. Storms's testimony did not change their calculus, Sammons pointed out that he was still worried about the specter of Dr. Moore's testimony. Likewise, Hollman "didn't see the value" in having Dr. Prewett testify after Dr. Storms but conceded that, "at that point, I'm not sure any of us really knew what to do." Doc. 75-17, at 59, 62.

### 3.

In his first state habeas petition, Hittson claimed that his trial counsel failed to render effective assistance because they did not call Dr. Prewett or Ms. Shults during the penalty phase—even after Dr. Storms testified. After the evidentiary hearing, Hittson elaborated on this claim, arguing in his post-hearing brief that "counsel's decision to withhold psychological evidence during the penalty phase of trial was uninformed,"—and therefore, by definition, not strategic—because counsel "inexplicably failed to interview Dr. Coplin prior to trial." Doc. 76-1, at

69

31, 34.  In the alternative, Hittson contended that, "[e]ven if the investigation could be said to be reasonable . . . [c]ounsel's purported reason for withholding the evidence" was unreasonable because they only spent thirty minutes reviewing Drs. Coplin's and Storms's reports—leading to "a non-strategic rush to judgment."  Id. at 36–37.  Because of such "blind decision-making," counsel failed to recognize that "Dr. Coplin's report was mostly positive," and their "concern over Dr. Storms's potential testimony also was exaggerated and unfounded."  Id. at 38, 39.  Moreover, "any basis for withholding [Dr. Prewett and Ms. Shults] disappeared when Dr. Storms recounted [Hittson's 'hillbilly' and 'asshole'] statements . . . ."  Id. at 39.

In denying habeas relief, the Butts County Superior Court held that Hittson had failed to show that his attorneys' conduct fell below the "objective standard of reasonableness" required by the Sixth Amendment, and, in the alternative, that Hittson had not been prejudiced by the complained-of conduct—i.e., he failed to establish either of Strickland's prongs.

The Superior Court found the defense attorneys' assessment of the mental health evidence to be reasonable:

> [T]rial counsel's decision to forego mental health evidence was reasonable based [solely] upon the fear that Dr. Moore might testify . . . .
>
> . . .

70

[Moreover], in light of the contradictions to Dr. Prewett's testimony which are presented by the reports of Coplin and Storms, the possible negative inferences which could be drawn from the psychological reports, as well as the conclusions drawn in the reports concerning Hittson's responsibility for the crime, the Court concludes that it was reasonable for trial counsel to conclude that the reports of Storms and Coplin were unfavorable. [Therefore] trial counsel's decision not to present the testimony of Dr. Prewett and Ms. Shults, which was based on the aforementioned reasonable conclusion was not unreasonable.

Doc. 76-4, at 17, 19 (citation omitted). Even after Dr. Storms testified, the court believed that enough unfavorable evidence remained—unrelated to the "hillbilly" and "asshole" statements—to support counsel's decision not to call their experts. And the court brushed aside the "uninformed judgment" argument because, in the court's view, thirty minutes was sufficient time to digest Drs. Coplin's and Storms's reports, "as the reports are not lengthy [(together they totaled sixteen pages)], and Dr. Coplin's report contains a summary which would make it possible to determine the substance of his testimony within that period of time." Id. at 17.

In the alternative, the court held that, even if trial counsel had been constitutionally deficient, the expert testimony did not create a reasonable probability of a different result:

[I]n light of all the evidence adduced, including the crime committed, the gruesome nature of that crime, Petitioner's characterization of the victim after the crime, the mitigation evidence which was actually presented, and the possibly unfavorable psychological testimony

71

which includes not only [Drs. Prewett's,[44] Coplin's, and Storms's findings], but the possibility of Dr. Moore, the defense's own expert, testifying that Travis was "just mean," the Court does not believe there to be a reasonable probability that the jury would have returned with a sentence of life had Ms. Shults and Dr. Prewett been presented in the penalty phase.

Id. at 21 (citations omitted).

Hittson applied to the Georgia Supreme Court for a certificate of probable cause, claiming error in the Superior Court's application of both Strickland prongs. He maintained that thirty minutes was not enough time for his attorneys to assess the reports and, in their rush to judgment (which they manufactured by failing to interview Dr. Coplin before trial), "[t]hey overlooked helpful material in the reports and misinterpreted irrelevant material as harmful." Doc. 76-6, at 26. The Supreme Court found no merit to his arguments and accordingly denied a CPC.

In his federal habeas petition, Hittson contended that the state courts unreasonably applied Strickland when they found the defense team's assessment to be reasonable: "In these circumstances, counsel could not possibly make an informed decision to withhold psychiatric evidence"; "[i]n their rush during a 30 minute recess, the lawyers misread the reports, overlooking helpful material, and misinterpreting irrelevant material as harmful." Am. Pet. for Writ of Habeas

---

[44] The court pointed out that some of Dr. Prewett's testimony could have worked against Hittson's interests—e.g., the Borderline Personality Disorder diagnosis and his opinion that Hittson was violent and impulsive.

72

Corpus, ECF no. 45, at 48.  The District Court evaluated the experts' findings and agreed with the Butts County Superior Court's reasons for holding that Hittson's counsel acted reasonably—going as far as to note that "trial counsel more likely would have been ineffective if they had opened the door to the damaging testimony of Dr. Coplin, Dr. Storms, and Dr. Moore,"—"regardless of the mitigation strategy that capital defense lawyers choose, they are often damned if they do, and damned if they don't when they decide to use, or not use, mental health testimony." Hittson, 2012 WL 5497808, at *48 (quotation marks omitted).

B.

Like the District Court, we review the state courts' rejection of Hittson's ineffectiveness claim through the lens of AEDPA and, accordingly, look only to whether the Georgia Supreme Court had a reasonable basis in the record to conclude that Hittson's ineffective-assistance claim was meritless.

AEDPA review of a state court's adjudication of a Strickland claim is an especially onerous standard for a federal habeas petitioner to overcome.  We begin with Strickland's performance prong, which, in staking out the standard for constitutionally defective representation, demands that courts give considerable deference to trial counsel's judgment.  See Richter, __ U.S. at __, 131 S. Ct. at 788 ("Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing

73

counsel, and with the judge."). Because it would be "all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. This presumption insulates all but those errors that are "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687, 104 S. Ct. at 2064.

To show that an attorney failed to discharge his Sixth Amendment duty, a petitioner must establish that the attorney's conduct "amounted to incompetence under 'prevailing professional norms.'" Richter, __U.S. at __, 131 S. Ct. at 788 (quoting Strickland, 466 U.S. at 690, 104 S. Ct. at 2066) (emphasis added). "The [Strickland] test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done." White v. Singletary, 972 F.2d 1218, 1220 (11th Cir. 1992). "[A] petitioner must establish that no competent counsel would have taken the action that his counsel did take." Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc) (emphasis added).

Thus, "[e]ven under de novo review, the standard for judging counsel's representation is a most deferential one." Richter, __ U.S. at __, 131 S. Ct. at 788.

74

But "[e]stablishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." Id. (citations and quotation marks omitted). "The question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." Knowles v. Mirzayance, 556 U.S. 111, 123, 129 S. Ct. 1411, 1420, 173 L. Ed. 2d 251 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," then a federal court may not disturb a state-court decision denying the claim. Richter, __ U.S. at __, 131 S. Ct. at 788.

Hittson has come nowhere close to satisfying this combined Strickland–AEDPA standard. At best, he has demonstrated that his attorneys faced a tough choice—they had to let the jury hear all the expert testimony or none of it and, based on their assessment of the evidence, they decided that this would do more harm than good. Such a showing is not enough to establish ineffectiveness under a de novo application of Strickland—much less justification for upsetting the Georgia high court's decision under § 2254(d)(1).

We need not rehash the expert evidence. It suffices to say what should be evident: The experts' findings were a mixed bag (even after the "hillbilly" and

75

"asshole" statements came in)—some of what they had to say would have been good for Hittson, and some would have been bad. The defense team's judgment that the findings were more aggravating than mitigating is precisely the type of game-time decision that Strickland insulates from Monday-morning quarterbacking. See Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc) ("Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.").

Hittson tries to avoid the broad deference owed to defense counsel's best judgment by arguing that their "decision" was just guesswork, because they failed to fully investigate the other experts' findings. The record does not support this argument. First, even without considering Drs. Storms's and Coplin's findings, trial counsel had reason enough to forego Dr. Prewett's testimony based solely on the risk that the State (and then the jury) would hear from Dr. Moore. A reasonable attorney could have concluded, as Sammons did, that "there was [not] anything worth doing to take the risk of . . . having the State put our psychiatrist on the stand to testify that our client was just mean," Doc. 75-16, at 103—not to mention Dr. Moore's Antisocial Personality Disorder diagnosis, his observation that Hittson was "always hostile and very violent on alcohol," and the report's references to Hittson's burglary arrest and theft from his parents, Doc. 75-20, at 38–39.

76

Even so, the team reserved judgment until after they had access to Drs. Coplin's and Storms's reports and after the court ruled that Dr. Prewett's or Ms. Shults's testimony would allow the state to call Drs. Coplin or Storms in rebuttal. Hittson's contention that thirty minutes was not enough time for three attorneys and a psychologist to digest two eight-page reports is little more than wishful thinking.[45]  The trial team was already familiar with Hittson's psychological profile from their discussions with Drs. Prewett and Moore, and the trial judge told them, point blank, "I don't think y'all are going to find that [Dr. Coplin's report is] going to be for the benefit of Mr. Hittson."  Doc. 74-8, at 47.  As we have just said, their assessment of the evidence was objectively reasonable, and Hittson has done nothing to overcome the strong presumption that counsel "made all significant decisions in the exercise of reasonable professional judgment."  Strickland, 466 U.S. at 690, 104 S. Ct. at 2066.

_____

[45] Hittson quibbles with some of the aggravating parts of the reports that his trial attorneys highlighted in the state habeas proceedings.  He forgets, though, that he bears the burden of proving his attorneys' incompetence; it is not up to defense counsel to articulate each and every reason they had for a single decision made in the course of an entire trial, litigated years ago.  Richter, __ U.S. at __, 131 S. Ct. at 790 ("[C]ourts may not . . . insist [that] counsel confirm every aspect of the strategic basis for his or her actions.  There is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect." (quotation marks omitted)); see also Chandler, 218 F.3d at 1315 n.16 ("To uphold a lawyer's strategy, we need not attempt to divine the lawyer's mental processes underlying the strategy.").  The only "evidence" Hittson puts forth to support his argument that the defense team's decision was uninformed is the very fact that the defense team found the reports to be, on the whole, unfavorable.  In other words, Hittson argues that the attorneys' assessment of the expert evidence was unreasonable because it was uninformed, and as proof that it was uninformed, he points to their unreasonable assessment.  Needless to say, such tautology is unpersuasive.

That the attorneys might have been able to glean some information from Dr. Coplin before trial is irrelevant.[46]  For context, we note that Dr. Coplin interviewed Hittson on Friday, February 12, 1993; Dr. Storms interviewed Hittson on Saturday and Sunday February 13 and 14; and jury selection began on Tuesday, February 16.  Assuming that the attorneys could have found time to run down Dr. Coplin (before the state habeas court, Hittson never asked the attorneys why they didn't interview Dr. Coplin), Hittson has produced no evidence to show that he would have told them anything other than what was in his report (Hittson did not call Dr. Coplin during the state habeas proceedings).  At most, Hittson has shown that trial counsel might have been able to learn—slightly earlier—the same information they got from Dr. Coplin's report.

Courts are not in the business of micromanaging attorney trial prep.  See Richter, __ U.S. at __, 131 S. Ct. at 788 ("[I]ntrusive post-trial inquiry threaten[s] the integrity of the very adversary process the right to counsel is meant to serve."

---

[46] In his federal habeas petition and brief to this court, Hittson claims that his counsel also should have interviewed Dr. Storms before trial.  The first time Hittson made this claim was in his CPC application to the Georgia Supreme Court.  Putting aside Hittson's failure to present this argument to the Butts County Superior Court, there is no support in the trial record (and obviously none in the collateral record) for the proposition that Hittson's attorneys could have obtained Dr. Storms's findings prior to trial.  In the pretrial hearing in which the trial court ordered Hittson to submit to an examination by Dr. Storms, the court explained that neither side had an obligation to disclose their respective experts' findings until the defense team decided whether they were going to use their expert evidence.  Thus, Dr. Storms had no obligation to disclose his findings to the defense team.  In fact, after Dr. Storms interviewed Hittson, Sammons tried to ask him about his impressions in the parking lot, but Dr. Storms rebuffed his inquiries.

78

(quotation marks omitted)); Strickland, 466 U.S. at 490, 104 S. Ct. at 2066 ("Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel . . . ."). We are all too familiar with the strain of claims alleging ineffective assistance because an attorney could have interviewed one more witness, read one more document, or chased down one more loose end.  In the face of these claims, courts have explained ad nauseam that attorneys are not required to conduct an exhaustive investigation of each and every decision made at trial—merely a reasonable one. See Strickland, 466 U.S. at 691, 104 S. Ct. at 2066 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."); Richter, __ U.S. at __, 131 S. Ct. at 789 ("Counsel [is] entitled to . . . balance limited resources in accord with effective trial tactics and strategies.").

With unlimited time and resources, there is always something more that might have been done in a capital case—such allegations "prove[] at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel." Waters, 46 F.3d at 1514.  Hittson takes this worn-out argument one step further—complaining, not that his attorneys failed to investigate a particular line of inquiry,

79

but that they didn't investigate it <u>fast enough</u>.  We refuse to stretch the Sixth Amendment to include such a right.

In sum, Hittson has failed to show that his attorneys' decision to forego expert testimony fell below an objective standard of reasonable attorney conduct— much less that the state courts unreasonably applied <u>Strickland</u> in rejecting his Sixth Amendment claim.  The District Court's rejection of habeas relief on Hittson's <u>Strickland</u> claim is, accordingly, affirmed.

VII.

Hittson's final constitutional claim is that the State withheld Vollmer's psychiatric report and post-arrest letters he wrote from jail, in violation of <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) .

Under <u>Brady</u>, "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment."  <u>Id.</u> at 87, 83 S. Ct. at 1196–97.  But "the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense."  <u>Kyles v. Whitley</u>, 514 U.S. 419, 436–37, 115 S. Ct. 1555, 1567, 131 L. Ed. 2d 490 (1995).  To prevail on a <u>Brady</u> claim, a

80

defendant must establish three elements: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281–82, 119 S. Ct. 1936, 1948, 144 L. Ed. 2d 286 (1999).

We focus on the third element.[47]  To show "prejudice," or "materiality," under Brady, the petitioner must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles, 514 U.S. at 433, 115 S. Ct. at 1566 (quotation mark omitted).  This process, "will necessarily require a court to 'speculate' as to the effect of the new evidence." Sears v. Upton, __ U.S. __, 130 S. Ct. at 3259, 3266, 177 L. Ed. 2d 1025 (2010).[48]  "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a

---

[47] There has been considerable debate as to whether Hittson's trial counsel or first state habeas counsel could have, or in fact did, obtain the psychiatric report.  Because we conclude that the report would not have made a difference, we need not wade into the quagmire that has developed over whether or why the report was unavailable. Cf. Strickler, 527 U.S. at 295, 119 S. Ct. at 1955 (interchangeably using the Brady materiality requirement and the procedural-default prejudice requirement).

[48] Sears explained this in the context of Strickland prejudice, but the point obviously holds true for the identical Brady materiality test.

81

verdict worthy of confidence."[49]  Kyles, 514 U.S. at 434, 115 S. Ct. at 1566.  In conducting this analysis, courts first evaluate the effect of each suppressed item on its own and then weigh the cumulative impact of all of the suppressed evidence. Id. at 436 n.10, 115 S. Ct. at 1567 n.10.

Vollmer's psychiatric report was prepared in February 1991—more than a year before the murder—by R. J. Dusan, a social worker in the psychiatric department of the Naval Hospital in Jacksonville, Florida, where the Forrestal was stationed at the time.  The Forrestal's flight surgeon requested the psychiatric evaluation because Vollmer's attitude was affecting his work performance and causing interpersonal problems aboard the ship.  After interviewing Vollmer and reviewing his medical and military records, Dusan diagnosed Vollmer with "severe" Antisocial Personality Disorder and recommended that he be discharged from the Navy.  The hospital's chief of psychiatry, Dr. Donald Gibson, signed off on the report—he did not interview Vollmer or prepare the report.

The two jailhouse letters were addressed to Joleen Ward, a sailor on the Forrestal and friend of Vollmer's; they were written after Vollmer was arrested but before Hittson's trial.  The letters are a few pages each and ramble through a

---

[49] The Brady materiality test is more stringent (from a petitioner's perspective) than the Brecht "substantial and injurious effect" standard that we applied to Hittson's Estelle claims. See Kyles v. Whitley, 514 U.S. 419, 435–36, 115 S. Ct. 1555, 1566–67, 131 L. Ed. 2d 490 (1995).

82

variety of topics, including the murder investigation, Vollmer's ex-wife, Ms. Ward's boyfriend, foreign affairs, recollections of good times with friends, sports, jokes, and poetry. Of chief relevance to Hittson's <u>Brady</u> claim are Vollmer's references to his impending prosecution, in which he casually dismisses the likelihood of a conviction because of police incompetence and because "[t]hey're in my hometown . . . with my hand picked judge and my hand picked jury." Doc. 56-15, at 8. He also wrote, "only two people actually know what happened, and I've never talked to any cops or made a confession, so it looks like the whole world[']s gonna have to wait till August to hear me speak, and only if I feel like it." <u>Id.</u> at 17.

As recounted earlier, in rejecting Hittson's second state habeas petition, the Butts County Superior Court concluded that Hittson could have obtained Vollmer's psychiatric report during trial or in his first state habeas proceeding, and so the report claim was procedurally defaulted. Nonetheless, the court analyzed the report under <u>Brady</u>'s materiality requirement, along with the post-arrest letters, and concluded that the suppressed evidence was not material, either individually or collectively, because it was duplicative of other evidence put on by the defense during the penalty phase. In his CPC application, Hittson argued that his psychiatric report claim was properly before the court on the merits, and that the suppressed evidence was material, both individually and cumulatively. The

83

Georgia Supreme Court summarily denied his CPC application.  As explained above, this was a rejection on the merits, and so our task is to review the record before the Georgia Supreme Court to determine if there is any reasonable basis to support the court's denial of relief.  See Richter, __ U.S. at __, 131 S. Ct. at 784.

We find ample support in the record for the conclusion that Vollmer's psychiatric report and post-arrest letters did not create a reasonable probability of a different result.  We examine this evidence separately and then cumulatively.

A.

In analyzing the materiality of the psychiatric report—as with any piece of evidence—we must necessarily determine how Hittson would have used it at trial and then weigh the "tendency and force" of the evidence as it would have been presented to the jury.  See Kyles, 514 U.S. at 436 n.10, 115 S. Ct. at 1567 n.10.  Throughout his state and federal habeas proceedings, Hittson has brandished Vollmer's diagnosis as if it were dispositive proof of every attribute his trial team sought to ascribe to Vollmer during the penalty phase.  But Hittson has consistently failed to explain how the evidence he produced to this effect in the 2005 to 2009 time frame, when he was litigating his state habeas petition, relates back to his trial in 1993.  More importantly, Hittson has lost sight of the fact that Vollmer was not the one on trial.  He apparently assumes that anything that would have made Vollmer look bad necessarily would have helped him, but culpability

84

for this crime was not a zero-sum game.  Hittson has not carefully traced the inferences the jury could have drawn about Vollmer to the jury's ultimate decision to return a death sentence.  Thus, we must parse the record to answer the only two questions that matter: what would the jury have heard or seen during Hittson's 1993 trial, and what effect would that have had on the jury's conclusion that Hittson deserved the death penalty.

In the habeas proceedings before the Butts County Superior Court, Hollman testified that he would have either called the Navy personnel who prepared the report, or submitted the report as an exhibit, to "acquaint the jury with Mr. Vollmer's psychological condition" as a way to "buttress[] the defense" that "Vollmer was the stronger personality and the more intelligent of the two and that he, in fact, had induced Mr. Hittson to participate in this crime."  Doc. 56-9, at 115. We assume, for sake of discussion, that the report would have been admissible and Hittson's attorneys could have called Mr. Dusan (the social worker who interviewed Vollmer and prepared the report) or Dr. Gibson (the psychiatrist who signed off on the report) to testify regarding the contents of the report or meaning of the diagnosis.[50]  See generally Gissendaner v. State, 272 Ga. 704, 714, 532

---

[50] Hittson also claims that, with the benefit of Vollmer's report, his trial counsel would have decided to put on their own experts (we presume that he means Dr. Prewett) who would have then been able to explain the relevance of Vollmer's diagnosis in light of his assessment of Hittson.  We can give short shrift to this assertion.  As we have just discussed in detail, Hittson's

85

S.E.2d 677, 688–89 (2000) (explaining that the Georgia rules of evidence are relaxed in the penalty phase of a capital case). We also assume that, in admitting evidence of Vollmer's mental condition, Hittson would not have opened the door to damaging rebuttal evidence—in particular, his own Antisocial Personality Disorder diagnosis made by Dr. Moore.

We agree that, when used in this manner, the report could have supported Hittson's mitigation theory during the penalty phase; however, it is not the silver bullet that Hittson tries to make it out to be. See Strickler, 527 U.S. at 289, 119 S. Ct. at 1952 ("[The suppressed evidence] might have changed the outcome of the trial. That, however, is not the standard . . . . He must [show] that there is a reasonable probability that the result of the trial would have been different . . . .") (quotation marks omitted).

As an initial matter, we are skeptical as to how probative the report would have been to the crux of Hittson's mitigation theory—that he was acting under Vollmer's control on the night of the crime. In his report, Dusan made the

---

defense team had a number of well-founded reasons not to call their experts—not the least of which was that they would have risked the State calling Dr. Moore to testify that he had diagnosed Hittson with Antisocial Personality Disorder. In his state habeas proceedings related to the Brady claims, Hittson did not submit a scrap of evidence from Drs. Prewett or Moore, and neither Hollman nor Sammons could say that the added value of Vollmer's psychiatric report would have changed their risk calculus and led them to put on one or all of their experts. Thus, we limit our materiality review to the admission of the psychiatric report and testimony from Mr. Dusan or Dr. Gibson explaining the report.

following observations—drawn from an hour-and-a-half interview and a review of

Vollmer's medical and military records:

> This patient admits that as child there was lying, stealing, truancy, vandalism, initiating fights, and running away from home.  Presently he is unable to sustain consistent work behavior.  He frequently becomes intoxicated, is promiscuous and has no remorse for his actions as they affect others.

Doc. 56-15, at 4.  This paragraph recites—nearly verbatim—the diagnostic criteria

for Antisocial Personality Disorder listed in the Diagnostic and Statistical Manual

of Mental Disorders ("DSM") in print in 1991.  See Am. Psychiatric Ass'n,

Diagnostic and Statistical Manual of Mental Disorders, at 344–46 (3d ed., rev.

1987) (hereinafter "DSM-III-R").  According to the DSM-III-R, a person with

Antisocial Personality Disorder typically "fail[s] to conform to social norms and

repeatedly perform[s] antisocial acts that are grounds for arrest, such as destroying

property, harassing others, stealing, and having an illegal occupation."  Id. at 342.

They also "tend to be irritable and aggressive and to get repeatedly into physical

fights and assaults," "[t]ypically . . . are promiscuous," "they generally have no

remorse about the effects of their behavior on others; they may even feel justified

in having hurt or mistreated others," and they have "the conviction (often correct)

that others are hostile towards them."  Id. at 342–43.

Dr. Gibson testified in the state habeas proceedings that a "severe" diagnosis

was typically given to indicate "that this patient has a personality disorder that is of

87

such severity as to preclude further military service"—"so people will know that we're not just kidding, this is something that's serious and needs to be taken care of right away."  Doc. 56-11, at 109, 110.  Dr. Gibson also explained that a person with severe Antisocial Personality Disorder, "has adaptability problems.  He has interpersonal problems.  He has problems with authority.  He has problems doing what he's supposed to do.  He's done illegal things, things for which if he had gotten caught doing them he would have been arrested.  He violates the rights of everybody."  Id. at 110.  This testimony also tracks the DSM-III-R's description of the disorder (Dr. Gibson did not evaluate Vollmer and, understandably, did not recall signing off on the 1991 report when he testified in 2007 before the state habeas court).

Critically lacking is any support for the theory that Vollmer had a propensity for manipulating or controlling others.  Neither the report, the DSM, nor Dr. Gibson's description indicate that a person with Antisocial Personality Disorder in general, or Vollmer in particular, is adept at bending others to his will.[51]  The "essential feature" of the disorder is described as "a pattern of irresponsible and antisocial behavior"—i.e., a "fail[ure] to conform to social norms."  DSM-III-R, at

[51] The DSM lists, as one of the diagnostic criteria for the disorder, "no regard for the truth, as indicated by repeated lying, use of aliases, or 'conning' others for personal profit or pleasure."  DSM-III-R, at 345.  Dusan did not rely on this criterion in reaching his diagnosis (the DSM lists ten diagnostic criteria, of which a doctor must find four in order to reach a diagnosis).

342. While this type of behavior might include attempts to control others, there is nothing in the report or the diagnosis that indicates that Vollmer possessed this particular attribute among the host of traits that could be deemed "antisocial."

Hittson submitted an affidavit to the Butts County Superior Court from Dr. Jerry Lee Brittain, a neuropsychologist who, in 2002, reviewed Vollmer's military and medical records along with the various expert assessments of Hittson that were prepared for trial. Dr. Brittain gave the following opinion:

> The combination of Mr. Vollmer's extremely high level of intelligence[52] with an Antisocial Personality Disorder suggests a very manipulative, clever, sophisticated con artist—this is typically a person who often gets away with their infractions because they are smart enough to avoid getting caught, many times at the expense of a weaker codefendant.

Doc. 56-16, at 48. In forming this opinion, Dr. Brittain relied on the version of the DSM in print in 2002, which was published nearly a decade after Vollmer was diagnosed with Antisocial Personality Disorder. See generally Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (4th ed., text rev. 2000) (hereinafter "DSM-IV-TR"). Dr. Brittain cited the updated version of the DSM for the proposition that "[i]ndividuals with Anti-social Personality Disorder 'are frequently deceitful and manipulative in order to gain personal profit or

---

[52] The psychiatric report pegged Vollmer's intelligence at "average or above." Dr. Brittain presumably got the idea that Vollmer possessed "extremely high" intelligence from Vollmer's Armed Forces Qualifying Test scores—which were in the 99th percentile.

pleasure, (e.g., to obtain money, sex, or power).'"  Doc. 56-16, at 46 (quoting DSM-IV-TR at 702).  This language, or its equivalent, is not in the version of the DSM in print in 1991 and 1993 (the DSM-III-R), and Dr. Brittain did not explain whether these traits were commonly understood to be a characteristic of the disorder in 1991 and did not otherwise attempt to establish what an expert could have testified to during Hittson's 1993 trial.

Hittson also called Dr. Keith Caruso in the habeas proceedings in state court. Dr. Caruso is a forensic psychiatrist who, in 2007, reviewed Vollmer's report, the various expert assessments of Hittson, a transcript of the penalty phase, and a variety of other evidence related to Vollmer (much of which was not available to the defense at the time of trial).  The following colloquy ensued:

Q     Why is [Vollmer's diagnosis] significant to understanding Mr. Hittson's behavior on the night of the offense?

A     Well, I think it was considerable, there is evidence that [Hittson's behavior] may have been considerably influenced by Mr. Vollmer, that Mr. Hittson's behavior as a passive, dependent individual, he would, potentially he would be very easily influenced by someone with antisocial personality disorder, particularly someone who can be conning and manipulative.

Q     And is there evidence in the record, of the stuff that you reviewed, that Mr. Vollmer was conning, cunning and manipulative?

A     Yes.

. . .

90

Q      What does it tell me, as a lay person, what does it mean when you have a severe antisocial personality disorder?

A      You've got someone who essentially can, I think for the purposes of this case, someone who potentially could be very good at controlling and manipulating someone else. And you had a combination of two individuals, between Mr. Vollmer with a diagnosis of antisocial personality disorder and then Mr. Hittson, who has been described as having a passive, dependent personality, that he would be particularly prone to manipulation by someone as bright and antisocial as Mr. Vollmer has been described.

Doc. 56-12, at 16, 18. Dr. Caruso's testimony spilled the bounds of the psychiatric report, wandering into the other experts' assessments of Hittson and evidence that was either already before the jury or was not available to the defense at the time of trial. Hittson made no attempt to establish what portion, if any, of Dr. Caruso's testimony his trial counsel could have presented during the 1993 trial.

We do not question Drs. Brittain's or Caruso's professional opinions, but, given that they were formed in 2002 and 2007, with the benefit of hindsight and evidence that was not available the defense team during Hittson's trial, we do not find their opinions particularly helpful in weighing the impact of Vollmer's 1991 diagnosis on the jury's penalty-phase deliberations during Hittson's 1993 trial.[53]

---

[53] In the state habeas court, the State presented expert testimony to counter Drs. Brittain's and Caruso's explanations of Vollmer's diagnosis. The State asked Dr. Coplin (the court-appointed expert from Hittson's trial), "because Vollmer was diagnosed with an antisocial personality disorder, what kind of impact would that have had on [Hittson's] actions on the night of the crime?" Dr. Coplin responded, "I don't think it would have had any, other than [Vollmer is] prone for repetitive behavior, trouble with the law. Antisocial is a sociopath, you know. It's a person who repetitively has no concept of the law." Doc. 56-12, at 3.

At bottom, Hittson has not produced evidence to show that his trial counsel could have called an expert to testify at trial who would have said, based on the 1991 Navy psychiatric report, that Vollmer had a propensity or aptitude for controlling others.

That is not to say, though, that Vollmer's psychiatric report would have been irrelevant.  Bo Sammons's assessment of the report, which he explained in the 2007 state evidentiary hearing, is on firmer footing.  In his view, the diagnosis would have helped them show that Vollmer was "a real bad guy"—that he was "amoral about the effect that things that he did had on other people."  Doc. 56-10, at 30, 80.  The report itself, the DSM-III-R, and Dr. Gibson's explanation of the diagnosis before the state habeas court (which was effectively a recitation of the DSM-III-R) all support the proposition that Vollmer had "no remorse for his actions as they affect others."  Doc. 56-15, at 4; see also DSM-III-R at 342 (Individuals with Antisocial Personality Disorder "generally have no remorse about the effects of their behavior on others.").

Accepting that this aspect of Vollmer's character had some bearing on Hittson's sentence, the idea that Vollmer had amoral or antisocial tendencies certainly would not have come as news to Hittson's jury.  The defense team had shipmates testify that Vollmer was violent, had a fixation with murder, and liked to tote around a bulletproof vest and sawed-off shotgun.  They submitted two letters

92

written by Vollmer in which he bragged about his illegal and amoral escapades. They had a witness read part of one of those letters in which Vollmer described a detailed plot to murder someone. One of Vollmer's friends testified that, after the murder, Vollmer often joked about having killed Utterbeck. Other shipmates testified that Vollmer doled out advice on getting rid of dead bodies. And, of course, the jury heard Hittson's uncontested version of the crime, in which Vollmer played a central role. The State never tried to rebut any of this evidence. It never tried to redeem Vollmer in the jury's eyes; in fact, the District Attorney made clear that Vollmer would be separately prosecuted for his role in the crime.

In light of the evidence presented by the defense, Vollmer's diagnosis would have simply put a label on something that was abundantly clear—something that was not really in controversy. Certainly, a medical diagnosis can carry more weight with a jury than lay testimony. And a report prepared before the crime by a neutral expert would have bolstered the credibility of lay witnesses whose view of Vollmer might have been skewed by their knowledge of his complicity in the crime. But where the point being proven is both uncontested and amply supported by the evidence, we can hardly say that additional evidence that would only reinforce the obvious is the type of evidence that puts the case in a whole new light, as required for relief under Brady.

More importantly, though, even if the report would have cemented an otherwise shaky proposition, proving Vollmer's bad character was not the lynchpin to securing a life sentence for Hittson. When considered in isolation, Vollmer's character is irrelevant to Hittson's punishment; i.e., making Vollmer out to be "a real bad guy" in the eyes of the jury did not automatically make Hittson less culpable for his own choices. As Hollman put it in the state habeas court:

> I wouldn't say that it was our mission to do everything that we could possibly do to make [Vollmer] look bad. I think that what we were trying to do is show that he was the lead actor in this terrible crime and that he was the one who actually was the primary mover in the murder and the dismemberment.

Doc. 56-9, at 125. In effect, the defense team's attempts to prove that Hittson was a pretty good guy and Vollmer was a really bad guy were a means to an end—a way of prodding the jury to infer that Hittson had not acted on his own volition but had instead been overborne by his evil co-defendant. While this was a sensible strategy, there is no question that the jury could have accepted their portrayal of Vollmer and still concluded that Hittson was responsible for his own actions. After all, Hittson confessed to swinging the bat, pulling the trigger, and cutting up Utterbeck's corpse.

While Brady's materiality requirement "is not a sufficiency of the evidence test,"—i.e., courts do not simply look to whether there is still enough evidence to support the result—a defendant must show "that the favorable evidence could

94

reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 434–35, 115 S. Ct. at 1566. "In the face of [an abundance of evidence to support the result] it should take more than supposition on . . . weak premises offered by [a habeas petitioner] to undermine a court's confidence in the outcome." Wood v. Bartholomew, 516 U.S. 1, 8, 116 S. Ct. 7, 11, 133 L. Ed. 2d 1 (1995) (per curiam). Vollmer's psychiatric report is simply not the type of evidence that undermines our confidence in Hittson's sentence. The Antisocial Personality Disorder diagnosis merely assigns a medical term to character traits that were already well-attested-to. And whatever reinforcing effect this "new" information would have had regarding Vollmer's bad character would have only minimally improved the chances that the jury would believe that Vollmer controlled Hittson on the night of the crime. Thus, the state court could have reasonably concluded that Vollmer's report was not material under Brady.

## B.

Like the psychiatric report, Vollmer's post-arrest letters are cumulative of evidence that was already before the jury and are only indirectly related to Hittson's sentence.

We begin with how the letters would have been used by Hittson's trial counsel. When Hollman was asked, in the state collateral hearing, if the post-arrest

letters would have been helpful at trial, he candidly replied, "[h]onestly, I don't know if they would have or not. I've read them. There are matters of interest that are contained in these letters. I don't know if they would or wouldn't have." Doc. 56-9, at 124. He conceded that he would have liked for the jury to have heard certain passages from the letters, because they would have "impacted on the jury's view of Mr. Vollmer in a negative way," but still explained, "I wouldn't say that it was our mission to do everything that we could possibly do to make [Vollmer] look bad. . . . [W]e were trying to . . . show that he was the lead actor in this terrible crime and that he was the one who actually was the primary mover in the murder and the dismemberment." Id. at 125.

Despite Hollman's ambivalence, we will assume that trial counsel would have submitted the post-arrest letters into evidence (along with the pre-arrest letters that were already in evidence) and could have had Ms. Ward, the recipient, read selected portions to the jury. In his arguments in both the state and federal habeas proceedings, Hittson has cherry-picked a few paragraphs from the post-arrest letters and touted them as "the best evidence" of "Vollmer's inflated and arrogant self-appraisal . . . complete indifference to the consequences of his actions . . . sophistication, dominance, arrogance, self-assurance, manipulation and control . . . [and] the unequal relationship (testified to by lay witnesses) between the two co-defendants." Hittson Appellee Br. at 41–42. This is hyperbole.

96

In the first of Hittson's excerpts, Vollmer wrote:

It's not like I'm going to be stuck in here forever.  Sure, I may do two or three more years at the most, but I wouldn't be surprised if I'm cut loose after the trial in August.  These fuckers haven't got a clue or a brain in their heads, and they'll be lucky if they keep their jobs after the public finds out how bad they've bungled the investigation and how far out of bounds they've stepped.  When this case goes to trial, it'll be a damn three ring circus.  They're in my hometown, for christ sakes, with my hand picked judge and my hand picked jury.  Everyone who's lived here since '73 are my character witnesses, and there isn't a man or woman who doesn't know me, at least in passing.  I used to think I didn't have a chance, because of the dirty, underhanded way the investigation was going, but now I know who doesn't have a chance.

Doc. 56-15, at 8.  Certainly, this maniacal rant reflects arrogance or delusions of grandeur.  Vollmer's pre-arrest letters, which the jury had, contained similar braggadocio.  Vollmer wrote that he was one of the three "Bad Asses" in the world; he had only lost one fight in his life; he toted a pistol and sawed-off shotgun to gang fights; he was "in tight with the Outlaws biker gang" and was "dealing grass at $130 an ounce and snow at $60 a gram"; he had bounties out on rival gang-members' heads; and he had "done more than most will do in their miserable lives." Doc. 74-15, at 16–17.  He explained, "I'm not afraid of dying and I have no problems with killing anyone.  Hand me $500 cash and I'll kill whoever you point your finger at.  Morals are for losers trying to justify their place in life." Id. at 17.  And, after describing a detailed plan to kill a man, he told the woman he was writing to that he would "spit on his lifeless body for you." Id. at 15.

97

It is possible that the above-quoted passage from Vollmer's post-arrest letter would have strengthened the existing evidence of Vollmer's brazenness or sense of superiority. It is also possible that this additional indictment of Vollmer's character would have made Hittson's mitigation theory slightly more believable to the jury. And it's possible that this incremental boost in believability would have led the jury to conclude that Hittson did not deserve the death penalty. But our task is not to stack inference upon inference—"petitioner's burden is to establish a reasonable <u>probability</u> of a different result." <u>Strickler</u>, 527 U.S. at 291, 119 S. Ct. at 1953 (emphasis in original). The tenuous connection between Vollmer's bad character and Hittson's death sentence is reason enough to conclude that more evidence that Vollmer was brazen, wicked, etc., wouldn't have turned the tide in Hittson's favor.

> Hittson next points us to Vollmer's veiled references to the crime:
>
> These fuckers couldn't come up with a better motive than "drugs" or "cult religion"? They're the fuckin Keystone Cops. I could sit on the shitter reading the paper and come up with more and better motives. . . . There are a lot of questions left unanswered, and I'm the only key to the mystery. They can assume and guess, but only two people actually know what happened and I've never talked to any cops or made a confession, so it looks like the whole world[']s gonna have to wait till August to hear me speak, and only if I feel like it.

Doc. 56-15, at 17. Apart from exhibiting more of Vollmer's aggrandizing style, this cryptic paragraph does little to help Hittson. It does tend to corroborate Hittson's uncontested account of the crime—at least insofar as it confirms

98

Vollmer's participation—and it implies that either Vollmer or Hittson had some undisclosed motive for the crime, but there is nothing from which the jury could have inferred that Vollmer was pulling Hittson's strings. Without more, it is impossible to say that this paragraph somehow advances Hittson's mitigation theory.

In fact, other parts of the letters contain similarly oblique references to the crime. Some of these passages could be read to inculpate Hittson:

> But the bit with Hittson really torqued my gonads cause it was obvious why he did it. . . . I kinda majorly screwed up his plan [to date Ward (the recipient)] and that just about sent him over the edge. Oh fucking well, I won't ever shed a fucking tear over his twisted love life. I'm a tad bent out of shape because I heard what he said to the cops about me, and I also heard Mike believed it. That really hurt me guys.

Doc. 56-15, at 17.

> I froze under pressure, Jo. That's all I can say. Tell Mike I got kicked out[54] on purpose, he was right about that. Things were more than a little dangerous (remember the fights before I left?[55]) so I bailed to avoid going overboard on a moonless night. Reasons I could never have told you guys at the time, do you understand.

Id. at 12. While vague, these ramblings could have been used by the State to undercut Hittson's mitigation theory—they hint that Hittson had a reason for

---

[54] After the crime, but before being arrested, Vollmer was discharged from the Navy for possession of marijuana.

[55] A handful of witnesses testified during the penalty phase that, shortly before Hittson and Vollmer were arrested, their relationship deteriorated and they got into a fight.

disliking Vollmer, that the confession was not entirely true, and that Vollmer was scared of Hittson, enough so to get himself kicked out of the Navy. While these passages, like the ones Hittson highlights, leave much to speculation, we cannot entertain Hittson's requests that we divine meaning from select parts without also considering the State's attempts to do the same.

When read as a whole and considered in light of the body of evidence before the jury, the letters have little bearing on their ultimate task of sentencing Hittson. The two new letters might have added a little more flavor to the jury's understanding of Vollmer's personality, but Vollmer was not on trial. And the handful of references to the crime itself raise more questions than answers. Given that Hittson did not pursue a "residual doubt" strategy during the penalty phase (and does not now argue that the letters would have enabled him to do so), we do not see how anything in the letters supports Hittson's mitigation theory that Vollmer held sway over him on the night of the murder. Accordingly, the record amply supports a conclusion that the post-arrest letters were not material under Brady.

C.

Because neither Vollmer's psychiatric report nor his jailhouse letters had much to do with Hittson's sentence, we need not rehash the above analysis to see if, when considered cumulatively, they might have turned the tide. It is sufficient

100

to say that the psychiatric report and post-arrest letters would have reinforced the existing evidence of Vollmer's bad character.  But the jury sentenced Hittson based on his own choices, and we find nothing in either the report or the letters that would have helped Hittson show that those choices were less than voluntary because Vollmer overpowered him psychologically.  Considered together, the evidence does not cast the case in such a different light as to entitle Hittson to a new sentencing proceeding.  Therefore, we affirm the District Court's holding that the state courts had a reasonable basis to conclude that the suppressed evidence was not material under Brady.

## VIII.

Hittson's final claim requires us to decide whether he should have been granted leave to further amend his federal habeas petition to add four brand-new ineffective-assistance claims that he did not raise in any of his state court proceedings, his original § 2254 petition, or his amended federal petition.  It is a matter of first principles that a state prisoner cannot raise claims for the first time in his federal habeas petition.  See 28 U.S.C. § 2254(b)(1)(A).  Hittson does not contest that he has failed to exhaust his "new" claims.  Instead, he would have us treat the claims as procedurally defaulted[56] and then excuse the default by relying

---

[56] Where a return to state court would be futile—because the petitioner's claims would clearly be barred by state procedural rules—a federal court can "forego the needless 'judicial

101

on the recent Supreme Court decisions <u>Martinez v. Ryan</u>, __ U.S. __, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012), and <u>Trevino v. Thaler</u>, __ U.S. __, 133 S. Ct. 1911, 1852 L. Ed. 2d 1044 (2013).  We decline to do so for reasons explained below.  We first explain the relevance of <u>Martinez</u> and <u>Trevino</u>, and then why Hittson cannot rely on those cases to excuse his procedural default.

## A.

A federal court may consider the merits of a procedurally defaulted claim only if the petitioner can show both "cause" for the default and "prejudice" from a violation of his constitutional right.  <u>Wainwright v. Sykes</u>, 433 U.S. 72, 84–85, 97 S. Ct. 2497, 2505, 53 L. Ed. 2d 594 (1977).  To establish cause, a petitioner must ordinarily "demonstrate 'some objective factor external to the defense' that impeded his effort to raise the claim properly in state court."  <u>Ward v. Hall</u>, 592 F.3d 1144, 1157 (11th Cir. 2010) (quoting <u>Murray v. Carrier</u>, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)).  Before its 2012 decision in <u>Martinez</u>, the Supreme Court had long held that § 2254 petitioners cannot rely on errors made by their state collateral counsel to establish cause.  See <u>Coleman v. Thompson</u>, 501 U.S. 722, 752–53, 111 S. Ct. 2546, 2566–67, 115 L. Ed. 2d 640

---

ping-pong'" and treat unexhausted claims as procedurally defaulted.  <u>Snowden v. Singletary</u>, 135 F.3d 732, 736 (11th Cir. 1998).  There is no doubt that Hittson's "new" claims are barred by O.C.G.A. § 9-14-51, as all of the claims could have been raised in Hittson's first or second state habeas petition.

102

(1991).  Martinez created a limited, equitable exception to Coleman where, (1) "a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding," as opposed to on direct appeal;[57] (2) "appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of Strickland"; and (3) "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one."  Martinez, __ U.S. at __, 132 S. Ct. at 1318–19 (citations omitted).

Shortly after Martinez was decided, Hittson sought leave from the District Court to further amend his federal habeas petition to add the following ineffective-assistance claims:

> [1]  Mr. Hittson Was Deprived of the Effective Assistance of Counsel under the Sixth Amendment When His Counsel Failed to Thoroughly Investigate His Upbringing, Background, and Mental Health and Failed to Secure More Time from the Trial Court for this Investigation.
>
> [2]  Mr. Hittson was Deprived of the Effective Assistance of Counsel Due to His Counsel's Failure to Alert the Trial Court that It Had

---

[57] Martinez dealt with Arizona law, which bars criminal defendants from raising ineffective-assistance claims on direct appeal.  __ U.S. at __, 132 S. Ct. at 1314 (citing State v. Spreitz, 202 Ariz. 1, 3, 39 P.3d 525, 527 (2002)).  The Court explained the reasons for this limitation as follows:

> By deliberately choosing to move trial-ineffectiveness claims outside of the direct-appeal process, where counsel is constitutionally guaranteed, the State significantly diminishes prisoners' ability to file such claims.  It is within the context of this state procedural framework that counsel's ineffectiveness in an initial-review collateral proceeding qualifies as cause for a procedural default.

Id. at __, 132 S. Ct. at 1318.

103

Forced Them Into a Conflict Regarding the Adequacy of the Waiver Signed by Mr. Hittson During His Evaluation by Dr. Storms.

[3]  Mr. Hittson Was Deprived of the Effective Assistance of Counsel by His Counsel's Failure to Independently Discover Exculpatory Material Suppressed by the State.

[4]  Mr. Hittson was Deprived of the Effective Assistance of Counsel Due at Motion for New Trial and Direct Appeal.

Second Am. Pet. for Writ of Habeas Corpus, ECF no. 94, at 2 (hereinafter "Second Am. Habeas Pet."). Hittson conceded that none of these claims had been raised in any of his state proceedings, but, relying on Martinez, asserted that the cause for this failure was his lawyers' incompetence during his first state habeas proceeding—when the claims should have been raised.

The District Court denied Hittson's motion because Georgia law allows defendants to litigate ineffective-assistance claims on direct appeal.[58] As the District Court pointed out, the Martinez exception to Coleman's general rule is limited to circumstances where state law "requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding." Martinez, __ U.S. at __, 132 S. Ct. at 1318 (emphasis added). So, "because Georgia did not bar Hittson from presenting his ineffective assistance of trial counsel claims during his direct appeal, Martinez is not applicable, and pursuant to Coleman, ineffective

---

[58] Georgia defendants may raise ineffective-assistance-of-trial-counsel claims on direct appeal if they have new counsel. White v. Kelso, 261 Ga. 32, 32, 401 S.E.2d 733, 734 (1991).

assistance of counsel during state post-conviction proceedings cannot serve as cause to excuse procedural default." Order Den. Mot. for Leave to Am., ECF no. 102, at 5.

After the District Court denied Hittson's motion to further amend, the Supreme Court decided Trevino. Trevino expanded Martinez's exception to states that effectively prohibit defendants from raising ineffective-assistance claims on direct appeal. __ U.S. at __, 133 S. Ct. at 1921 ("[A] distinction between (1) a State that denies permission to raise the claim on direct appeal and (2) a State that in theory grants permission but, as a matter of procedural design and systemic operation, denies a meaningful opportunity to do so is a distinction without a difference.").[59] By the time Trevino came down, Hittson's appeal in this court was well underway; however, he sought to expanded his COA, asking that we decide the effect of Trevino on his right to raise and litigate his new claims in the District Court. We granted his request and expanded his COA to resolve the following issue:

---

[59] Trevino considered Texas law. While Texas technically allows a defendant to raise ineffective-assistance-of-trial-counsel claims on direct appeal, "Texas procedure makes it 'virtually impossible for appellate counsel to adequately present an ineffective assistance [of trial counsel] claim' on direct review," and "Texas courts in effect have directed defendants to raise claims of ineffective assistance of trial counsel on collateral, rather than on direct, review." Trevino, __ U.S. at __, 133 S. Ct. at 1918–19 (quoting Robinson v. State, 16 S.W.3d 808, 810–11 (Tex. Crim. App. 2000)).

105

Whether Hittson should be allowed to amend his federal habeas petition to include claims of ineffective assistance of trial counsel which were previously defaulted through prior counsel in state habeas proceedings in light of the United States Supreme Court's ruling in Trevino . . . .

In supplemental briefing on the issue, Hittson has focused on Georgia's requirements for raising ineffective-assistance claims on direct appeal. He asserts that, under Georgia law, "there is no 'meaningful opportunity' to litigate ineffectiveness on direct appeal." Hittson Supp. Br. at 10 (quoting Trevino, __ U.S. __, 133 S. Ct. at 1921). While that may be true, we leave that question for another day because Hittson has failed to establish either of the other two elements of the Martinez exception—that "appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of Strickland"; or that "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one." Martinez, __ U.S. at __, 132 S. Ct. at 1918. We address each element in turn.

B.

To establish cause under Martinez, Hittson must demonstrate that state habeas counsel were themselves ineffective for failing to raise the four claims in his second amended § 2254 petition. This is a somewhat familiar inquiry, as petitioners have long been able to claim ineffective assistance of trial or appellate counsel to establish cause to excuse a procedural default caused by their trial or

106

appellate counsel. See Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986). As the Supreme Court has explained in that context, "[n]ot just any deficiency in counsel's performance will do . . . the assistance must have been so ineffective as to violate the Federal Constitution." Edwards v. Carpenter, 529 U.S. 446, 451, 120 S. Ct. 1587, 1591, 146 L. Ed. 2d 518 (2000) (citation omitted). While Martinez did not establish a constitutional right to counsel in state post-conviction proceedings, it did adopt the constitutional standard from Strickland as the standard governing petitioners' claims that their post-conviction counsel's conduct should excuse a procedural default. See Martinez, __ U.S. at __, 132 S. Ct. at 1318.

Accordingly, Hittson must establish that his habeas counsel's conduct "fell below an objective standard of reasonableness," and that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 688, 694, 144 S. Ct. at 2064, 2068. Obviously the merits of the underlying ineffective-assistance claims have some bearing on both Strickland prongs; collateral counsel would clearly not fall below Strickland's minimum competency requirements by deciding not to raise a meritless claim, and a petitioner would also not be prejudiced by his counsel's failure to do so.

But the merits of the underlying claim is only a part of the Strickland analysis. With unlimited time and the benefit of hindsight, a petitioner can come

107

up with any number of potentially meritorious ineffective-assistance claims that he now wishes his collateral counsel had raised. However, a petitioner does not establish constitutionally defective performance simply by showing that (a) potentially meritorious claims existed and (b) his collateral counsel failed to raise those claims. Murray, 477 U.S. at 486, 106 S. Ct. at 2644 ("[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default."). "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."[60] Jones v. Barnes, 463 U.S. 745, 751–52, 103 S. Ct. 3308, 3313, 77 L. Ed. 2d 987 (1983). "[A] per se rule that . . . the professional advocate, [is not] allowed to decide what issues are to be pressed . . . seriously undermines the ability of counsel to present the client's case in accord with counsel's professional evaluation." Id. at 751, 103 S. Ct. at 3313.

As we have explained, Strickland instructs courts to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"—that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466

---

[60] "Even in a court that imposes no time or page limits . . . [a] brief that raises every colorable issue runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions." Barnes, 463 U.S. at 753, 103 S. Ct. at 3313.

U.S. at 689–90, 104 S. Ct. at 2065–66.  To overcome this presumption, a petitioner must "establish that no competent counsel would have taken the action that his counsel did take."  Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc).

Thus, to show that his habeas counsel failed to provide the level of representation required by Strickland, Hittson must show more than the mere fact they failed to raise potentially meritorious claims; he must show that no competent counsel, in the exercise of reasonable professional judgment, would have omitted those claims.  Even assuming that the underlying ineffective-assistance claims are meritorious (which, as we explain in the following section, they are not), Hittson has not established that his state habeas counsel were incompetent for failing to raise them.

During Hittson's first state habeas proceedings, he was represented, pro bono, by several attorneys from the law firm Swindler & Berlin of Washington, D.C.  His habeas petition to the Butts County Superior Court was prepared by Andrew Lipps, Melissa Rogers, and John Lange.  Lipps and Rogers had previously assisted Hittson's trial counsel in the direct appeal to the Georgia Supreme Court,

109

and they were Hittson's primary attorneys before the Butts County Superior

Court.[61]

Their petition to the Superior Court included the following allegations of

trial-level incompetence:

> ¶ 17. Petitioner's counsel failed to render reasonably effective assistance to petitioner at virtually every critical stage before and during trial . . . .
>
> (1) Pre-Trial
>
> (a) Failure to Provide Plaintiff With the Assistance of Counsel During State Psychiatric Evaluation
>
> . . .
>
> ¶ 22. . . . Defense counsel arrived late to [Dr. Storms's] interview and was not present when Dr. Storms presented petitioner with the waiver form. . . . Accordingly, defense counsel never consulted with or advised petitioner with respect to the waiver.
>
> . . .
>
> (b) Failure to Raise Proper Grounds to Challenge Location of Trial
>
> . . .
>
> (2) Trial
>
> ¶ 26. Defense counsel failed to introduce any evidence whatsoever at the guilt-innocence phase of trial. . . .

---

[61] Lipps and Rogers represented Hittson during the state habeas proceedings conducted in October 1997, and Lipps and Rogers helped prepare the post-hearing brief, with the assistance of Jeremy Simon and Christina Novak—also of Swindler & Berlin. Neither Lipps nor Rogers worked on the CPC application to the Georgia Supreme Court.

(3)  Sentencing

¶ 27.  Counsel failed to introduce relevant mitigating evidence at the sentencing hearing. . . .

. . .

¶ 31.  Counsel called only lay witnesses in mitigation.  At no point did the defense present any testimony by Dr. Prewett or Ms. Shults. . . .

¶ 32. . . . Once Dr. Storms testified about [Hittson's "hillbilly" and "asshole"] statements, the sole reason for keeping Dr. Prewett and Ms. Shults off the stand evaporated. . . .

¶ 33. . . . [D]efense counsel did not provide clear guidance and assistance to petitioner as to whether he should testify, and ultimately forced him to forego the exercise of his right to testify.

. . .

¶ 39.  Counsel also failed to object to the prosecutor's closing argument at the sentencing hearing, in which the prosecutor engaged in an improper and misleading appeal to passion, prejudice and other arbitrary factors.

¶ 40. . . . Despite the prosecutor's improper reference to the defendant's exercise of his [Fifth Amendment] rights, defense counsel failed to object.

¶ 41.  Defense counsel also failed to object when the prosecutor referred to photographs of the victim in an effort to inflame the jury. . . .

¶ 42.  Counsel further failed to object to the trial court's responses to two questions that the jury asked during deliberations. . . .

¶ 43.  Defense counsel also failed to object to the trial court's failure in its sentencing instructions to explain to the jury the concept of mitigating circumstances . . . .

111

¶ 44.  Defense counsel also failed to object to the court's sentencing instructions that stated that the jury should "fix" or "recommend" that the death penalty be imposed.

Doc. 75-13 (citations omitted).  The Superior Court formed these allegations into eight separate ineffective-assistance claims, and denied all of them.

Hittson claims that Lipps and Rogers were incompetent for failing to tack on the four additional claims from his second amended § 2254 petition; however, he has alleged no facts to overcome the presumption that they exercised reasonable professional judgment in deciding which claims to raise and which claims to omit.

In his motion to further amend, Hittson made the following general allegations of habeas-counsel incompetence:

> [S]tate habeas counsel failed to pursue obvious avenues of investigation, resulting in a failure to raise meritorious and potentially meritorious claims.  Ineffective Assistance claims which Mr. Hittson believes are "substantial" and which have "some merit" were available to be litigated in state habeas proceedings but post-conviction counsel unreasonable failed to raise them.
>
> . . .
>
> Undersigned counsel represents, upon information and belief, that Mr. Hittson's original habeas attorneys performed no investigation beyond the limited investigation performed by Mr. Hittson's trial attorneys into Mr. Hittson's background.  In fact, original habeas counsel appear to have raised only claims which were apparent from a review of the trial transcript, failing to look beyond the record in order to determine whether Mr. Hittson's trial attorneys failed to discover, for instance, available and compelling mitigation evidence.  Further, original habeas counsel failed, absent any reasonable explanation, to bring a claim which was apparent from the record.

112

Mot. for Leave to Amend, ECF no. 93, at 5–7 (footnotes omitted).

Such generalized allegations are insufficient in habeas cases. Rule 2(c) of the Rules Governing Section 2254 Cases requires petitioners to "specify all the grounds for relief available to the petitioner" and "state the facts supporting each ground."[62] In other words, Rule 2(c) "mandate[s] 'fact pleading' as opposed to 'notice pleading,' as authorized under Federal Rule of Civil Procedure 8(a)." Borden v. Allen, 646 F.3d 785, 810 (11th Cir. 2011); see also Mayle v. Felix, 545 U.S. 644, 655, 125 S. Ct. 2562, 2570, 162 L. Ed. 2d 582 (2005) (explaining that § 2254 Rule 2(c) is more demanding than Fed. R. Civ. P. 8(a)). These generalized allegations from Hittson's motion to further amend do not satisfy Rule 2(c)'s requirements; Hittson has not alleged any facts to support his allegations that his state habeas attorneys were incompetent for failing to raise the four "new" claims.[63]

---

[62] Hittson's allegations of habeas-counsel ineffectiveness are not technically "grounds for relief," since they are pled only to establish cause to excuse his procedural default. See Martinez, __ U.S. at __, 132 S. Ct. at 1320. He must nevertheless plead the facts necessary to demonstrate that his lawyers were ineffective under the standard of Strickland. See Hill v. Lockhart, 474 U.S. 52, 60, 106 S. Ct. 366, 371, 88 L. Ed. 2d 203 (1985).

[63] Moreover, by relying on "information and belief," Hittson misapprehends the requirements of habeas pleading. "The reason for the heightened pleading requirement—fact pleading—is obvious. Unlike a plaintiff pleading a case under Rule 8(a), the habeas petitioner ordinarily possesses, or has access to, the evidence necessary to establish the facts supporting his collateral claim; he necessarily became aware of them during the course of the criminal prosecution or sometime afterwards." Borden, 646 F.3d at 810.

Hittson's trial was in 1993, and his first state habeas petition was filed in 1995. Hittson's current counsel has the same record and all of the evidence that was available to trial counsel and

Hittson's second amended § 2254 petition itself contains somewhat more specific allegations of habeas-counsel ineffectiveness. The allegations in the amended petition relate to each underlying ineffective-assistance claim, and so we examine the habeas-counsel allegations for each of the four "new" claims to see (1) if the allegations satisfy Rule 2(c)'s pleadings requirements and (2) if the allegations, taken as true, would allow a court to conclude that habeas counsel was ineffective under Strickland.

1.

Hittson's first ineffective-assistance-of-trial-counsel claim is:

Mr. Hittson Was Deprived of the Effective Assistance of Counsel under the Sixth Amendment When His Counsel Failed to Thoroughly Investigate His Upbringing, Background, and Mental Health and Failed to Secure More Time From the Trial Court for this Investigation.

Second Am. Habeas Pet., ECF no. 94, at 14. The related allegations of habeas-counsel ineffectiveness are:

---

first state habeas counsel. Current counsel also has the benefit of the record generated by Hittson's federal habeas proceedings and second state habeas proceedings. And Hittson's current counsel has access to their client. By the time they sought to further amend Hittson's federal habeas petition, in 2012, they had ample opportunity to conduct whatever investigation they needed to plead the facts necessary to support the claims therein. See Borden, 646 F.3d at 810 ("[T]he petitioner is, or should be, aware of the evidence to support the claim before bringing his petition.").

114

> First state habeas counsel conducted almost no independent investigation into the facts of Mr. Hittson's case outside the available record from trial and direct appeal.  First habeas counsel did not travel to the places where Mr. Hittson grew up or interview family, friends, neighbors and teachers; they did not hire an investigator or mitigation specialist; they did not have Mr. Hittson psychologically evaluated; and, they failed to speak with the mitigation witnesses offered at trial to see if they had further mitigating information about Mr. Hittson that would have changed the result of his trial.  It appears that first habeas corpus counsel also failed to request any educational records, medical or mental health records regarding Mr. Hittson or his family.  These omissions constitute deficient performance under the relevant standards of performance for habeas corpus attorneys at the time of first habeas counsel's representation of Mr. Hittson.

Id. at 13 (citations omitted).

> First state habeas counsel also failed to have Mr. Hittson evaluated by a neuropsychologist or other mental health professional, despite the fact that there were numerous red flags in his background indicating that he had come from a family of alcoholics, suffered neglect and abuse within his family, tried to commit suicide seven times as a teenager, had a learning disability, and suffered from recurrent blackouts even when he was not drinking.

Id. at 28 (citation omitted).

Hittson supported these allegations with an affidavit from Ms. Rogers and another from Mark Olive—a capital defense attorney from Tallahassee, Florida.  According to Ms. Rogers, she was the a third-year associate at Swindler & Berlin when she started working on Hittson's case.  She was supervised by Mr. Lipps, a

115

senior partner, and consulted with staff from the Georgia Resource Center[64] but she was "largely left to develop the case on [her] own." Rogers Aff., ECF no. 92-2, at 2. She confessed that, "[t]hough I received the impression that Mr. Hittson had a very rough childhood, I did not delve into Mr. Hittson's background and upbringing to find out if there was any information that should have been presented to the jury that was omitted at trial." Id. More specifically, she did not "hire a private investigator or a mitigation specialist," "have Mr. Hittson psychologically or medically evaluated," "travel to Nebraska or Oklahoma to talk with Mr. Hittson's family," or "speak with any of the lay witnesses presented at Mr. Hittson's trial." Id. She did "travel[] to Georgia on three or four occasions"; on those trips she "spoke with two out of the three trial attorneys on Mr. Hittson's case, as well as went to the District Attorney's office to review their file [and] also met with Travis Hittson on these occasions." Id. at 2–3.

Mr. Olive's affidavit attempted "to provide a description of the standard of care for counsel representing death-sentenced inmates in Georgia post-conviction cases in the mid-1990s." Olive Aff., ECF no. 92-3, at 3. He summed it up as follows:

---

[64] The Georgia Resource Center is a nonprofit that provides free legal representation to indigent Georgia death-row inmates. Hittson's current counsel are attorneys with the Georgia Resource Center.

116

> The standard of care for attorneys representing death-sentenced clients in state habeas corpus proceedings is, and was in the mid-1990s, that habeas counsel undertake a substantial and thorough investigation in order to identify all available claims for relief and all available evidence which may support those claims. It is not enough to confine one's efforts primarily to scrutiny of the trial and appellate record; counsel must investigate, and investigate thoroughly, issues which may not be readily apparent from the record . . . .

Id. at 7–8.

While Hittson has at least set out some substantive facts for us to analyze, these facts, even if taken as true, are insufficient to establish that his habeas counsel's conduct fell below Strickland's performance standard. Despite Mr. Olive's purported "standard of care," we have explained that "no absolute duty exists to investigate particular facts or a certain line of defense." Chandler, 218 F.3d at 1317. "[C]ounsel has a duty to make reasonable investigations or make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691, 104 S. Ct. at 2066 (emphasis added). "[C]ounsel need not always investigate before pursuing or not pursuing a line of defense. Investigation (even a nonexhaustive, preliminary investigation) is not required for counsel reasonably to decline to investigate a line of defense thoroughly." Chandler, 218 F.3d at 1318. "In assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Wiggins, 539 U.S. at 527, 123 S. Ct. at 2538.

117

Hittson has alleged that his collateral counsel failed to conduct certain investigatory steps, but he has not explained why, in this particular case, a competent attorney would have undertaken those steps—i.e., why a competent attorney would have been compelled to dig deeper into Hittson's background when faced with the evidence in the record. Hittson fails to mention that Hollman and Sammons—with whom Lipps and Rogers worked on direct appeal—undertook all of the investigatory steps that Hittson now complains of. They traveled to Nebraska, Pensacola, and Philadelphia to interview friends, family, counselors, teachers, shipmates, and officers; they hired a social worker to travel to Nebraska to interview many of the same people and work up an analysis of Hittson's background; and they had Hittson examined by a psychologist and a neuropsychiatrist. Lipps and Rogers had Sammons's and Hollman's notes from the witness interviews; they had Shults's report on Hittson's background and family dynamics; and they had Drs. Prewett's, Moore's, Storms's, and Coplin's findings regarding Hittson's mental condition.

It would have been reasonable for Lipps and Rogers to conclude that additional investigation into Hittson's background would not yield anything useful to Hittson's collateral attack. Even if additional investigation would have turned up new evidence that might have been relevant at trial (Hittson has not identified any such evidence), Lipps and Rogers could have reasonably concluded that they

118

did not have a viable "failure to investigate" ineffective-assistance claim given the investigation conducted by Sammons and Hollman. See Waters v. Thomas, 46 F.3d 1506, 1514 (11th Cir. 1995) (en banc) ("The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of [trial] counsel." (quotation marks omitted)); see also Chandler, 218 F.3d at 1316 n.20 ("Once we conclude that declining to investigate further was a reasonable act, we do not look to see what a further investigation would have produced." (quotation marks omitted)).

Rather than attacking trial counsel's investigation itself, Lipps and Rogers chose to challenge trial counsel's decision not to use some of the results of their investigation (i.e., trial counsel's decision not to call Dr. Prewett or Ms. Shults). Strickland instructs us to presume that they exercised reasoned professional judgment in doing so, and Hittson has alleged nothing to overcome that presumption.

2.

Hittson's next trial-counsel claim is:

> Mr. Hittson was Deprived of the Effective Assistance of Counsel Due to His Counsel's Failure to Alert the Trial Court that It Had Forced Them Into a Conflict Regarding the Adequacy of the Waiver Signed by Mr. Hittson During His Evaluation by Dr. Storms.

119

Second Am. Habeas Pet., ECF no. 94, at 29.  We briefly elaborate on the underlying claim.  After Dr. Storms testified to Hittson's "hillbilly" and "asshole" statements during the penalty phase of Hittson's trial, the trial court proposed that the State supplement the record by calling Dr. Storms to testify regarding the voluntariness of Mr. Hittson's statements and the circumstances surrounding the execution of a Miranda waiver at the beginning of the interview.  According to Hittson's second amended § 2254 petition, this line of inquiry "created an impermissible professional conflict for counsel" because, "along with Mr. Hittson, [his trial attorneys] were the only witnesses who could have testified regarding whether or not the waiver was truly a knowing and voluntary one, based on how they had prepared Mr. Hittson for his evaluation by the State's expert."  Id. at 30.  By failing to object to this conflict, trial counsel "deprived Mr. Hittson of the effective assistance of counsel, as well as the only witnesses aside from Mr. Hittson, who could counter the State's testimony that the waiver was valid."  Id. at 31.

His allegations of habeas-counsel ineffectiveness for failing to raise this claim are contained in one sentence: "Despite [the conflict of interest], first state habeas counsel from Swindler & Berlin failed to raise these issues and to litigate them, causing them to become procedurally defaulted."  Id. at 31–32.  As

120

explained above, the mere fact that counsel did not raise a particular claim does not

establish deficient performance under Strickland.

3.

Hittson's third-trial counsel claim is:

Mr. Hittson Was Deprived of the Effective Assistance of Counsel by
His Counsel's Failure to Independently Discover Exculpatory
Material Suppressed by the State.

Second Am. Habeas Pet., ECF no. 94, at 32.  This claim relates to the hotly-

contested issue of whether trial counsel could have obtained Vollmer's 1991

psychiatric report from a source other than the Houston County District Attorney—

an issue we did not address in part VII above because we concluded that the report

was not "material" under Brady.  Throughout his state and federal post-conviction

proceedings, Hittson has maintained, as part of his Brady claim, that "[t]rial

counsel were, at the time of trial, diligent in attempting to discover the mitigating

evidence in the State's possession."  Am. Pet. for Writ of Habeas Corpus, ECF no.

45, at 114–15.  Nonetheless, Hittson sought to add as a claim in his second

amended § 2254 petition, that "trial counsel was ineffective for failing to locate

and use [Vollmer's psychiatric report] on Mr. Hittson's behalf."  Second Am.

Habeas Pet., ECF no. 94, at 33–34.

Putting aside the merits of the underlying trial-counsel claim and the fact

that we have already concluded that the psychiatric report would not have created a

121

reasonable probability of a different result, we look to the relevant habeas-counsel ineffectiveness allegations. They are brief: "Had first habeas counsel not failed to make an alternative allegation of trial counsel ineffectiveness, the state habeas court would have been required to assess whether Mr. Hittson's trial counsel were ineffective for failing to discover the evidence." Id. at 34. Again, habeas counsel's failure to raise a claim does not, standing alone, establish deficient conduct under Strickland.

4.

Hittson's final claim is:

> Mr. Hittson was Deprived of the Effective Assistance of Counsel Due at Motion for New Trial and Direct Appeal.

Second Am. Habeas Pet., ECF no. 94, at 34. Hittson does not identify what his attorneys did wrong in his motion for a new trial or on direct appeal, nor does he explain how habeas counsel were ineffective for failing to raise these claims. He has not pled any facts to support relief and, thus, has not established that habeas counsel's conduct fell below Strickland's standard.

In sum, even if Hittson's underlying ineffective-assistance claims were "substantial," Hittson has failed to overcome the presumption that, in choosing not to present those claims to the Butts County Superior Court, his habeas counsel were exercising reasoned professional judgment. We nonetheless address the merits of the underlying ineffective-assistance-of-trial-counsel claims, explaining

122

Martinez's "substantial claim" requirement and why Hittson's trial-counsel claims are not "substantial."

C.

Martinez articulated the "substantial claim" requirement as follows:

> To overcome the default, a prisoner must . . . demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.  Cf. Miller-El v. Cockrell, 537 U.S. 322, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (describing standards for certificates of appealability to issue).

Martinez, __ U.S. at __, 132 S. Ct. at 1318–19.  Neither Martinez nor Trevino elaborated on or applied this standard, but we take the Court's reference to Miller-El to mean that it intended that lower courts apply the already-developed standard for issuing a COA, which requires "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

As the Court explained in Miller-El, "[a] petitioner satisfies this standard by demonstrating . . . that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  537 U.S. at 327, 123 S. Ct. at 1034.  Where a petitioner must make a "substantial showing" without the benefit of a merits determination by an earlier court,[65] he must demonstrate that "jurists of

---

[65] In the COA context, this situation presents itself where a district court dismisses a petitioner's federal petition on procedural grounds, without passing on the merits of the claims. Because § 2253 requires a "substantial showing of the denial of a constitutional right" before an

123

reason would find it debatable whether the petition states a valid claim of the

denial of a constitutional right." Slack v. McDaniel, 529 U.S. 473, 484, 120 S. Ct.

1595, 1604, 146 L. Ed. 2d 542 (2000). That does not mean that a petitioner must

show "that some jurists would grant the petition." Miller-El, 537 U.S. at 338, 123

S. Ct. at 1040. "[A] claim can be debatable even though every jurist of reason

might agree, after the . . . case has received full consideration, that petitioner will

not prevail." Id.

We observe that this standard is similar to the preliminary review conducted

by district judges in § 2254 proceedings. Rule 4 of the § 2254 Rules allows the

district judge to summarily dismiss a petition "[i]f it plainly appears from the

petition and any attached exhibits that the petitioner is not entitled to relief." The

Advisory Committee Notes further instruct that, in keeping with the heightened,

fact-pleading requirement in habeas cases, "the petition is expected to state facts

---

appeal may be taken, a petitioner must show, "[1] that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and [2] that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack v. McDaniel, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604, 146 L. Ed. 2d 542 (2000).

Where a petitioner seeks to overcome procedural default by way of Martinez, the court initially tasked with evaluating the underlying ineffective-assistance claims (in most future cases, it will be a district court) will necessarily have to decide whether the claims are "substantial" without the benefit of a state-court determination on the merits. The "substantial showing" standard from Slack, then, is a good fit for this task.

that point to a real possibility of constitutional error."  Advisory Committee Note to Rule 4 of the Rules Governing Section 2254 Cases (quotation marks omitted).

Thus, we examine the allegations in Hittson's proposed second amended § 2254 petition to see whether "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right."  In making this determination, we consider the fact-pleading requirement for § 2254 petitions, and the standard from Strickland.

### 1.

> Mr. Hittson Was Deprived of the Effective Assistance of Counsel under the Sixth Amendment When His Counsel Failed to Thoroughly Investigate His Upbringing, Background, and Mental Health and Failed to Secure More Time from the Trial Court for this Investigation.

Hittson's second amended § 2254 petition devotes considerable effort to explaining why trial counsel's conduct fell below Strickland's performance requirement.  The incompetent-conduct allegations boil down the claim that "[t]rial counsel were ineffective due to the lateness with which they began this investigation," and "[w]hile trial counsel originally called for more time and expert funds to conduct a thorough mitigation investigation . . . they failed to use the resources they were given effectively and presented very little information to the jury about the origins of Mr. Hittson's problems in his early family life and upbringing."  Second Am. Habeas Pet., ECF no. 94, at 20, 25.  Thus, "[t]rial

125

counsel's decision to offer very little evidence in mitigation regarding their client's family background and upbringing was not reasonable because they conducted an inadequate investigation into this area." Id. at 19–20.

Even if we assumed that Hittson could satisfy Strickland's performance prong based on these allegations of a constitutionally deficient investigation, he has not alleged any facts that would warrant a finding of prejudice. Hittson's petition only hints in broad, conclusory terms that more investigation by his trial counsel would have yielded something useful:

> [¶ 27]  There is nothing to suggest that further investigation would have been fruitless.

> [¶ 29]  Trial counsel . . . were on notice that Mr. Hittson's background was such that it would likely produce mitigating evidence regarding his upbringing, family, and psychological profile.

> [¶ 33]  [C]ounsel was on notice from their visit to Mr. Hittson's parents, the nature of Mr. Hittson's crime, and the results of the psychological evaluations that Mr. Hittson did have pre-trial, that there was likely more mitigating information about Mr. Hittson's childhood that a thorough investigation into his background and upbringing would likely uncover.

> [¶ 40]  But for trial counsel's ineffective representation, there is a reasonable probability that the result of trial, motion for a new trial, and the appeal would have been different.

Id. at 21–28.

Nowhere in these generalized claims does Hittson allege any facts that would allow a court to find "that there is a reasonable probability that, but for

126

counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 144 S. Ct. at 2068. Apart from broad statements that trial counsel's investigation was not thorough enough, Hittson does not identify what additional investigatory steps his attorneys should have taken; he has not identified a single piece of mitigating evidence that his attorneys failed to discover; he has not explained how that undiscovered evidence should have been presented to the jury; and he has not stated, even in conclusory fashion, that the jury would have returned a life sentence if they had heard the mitigating evidence that his attorneys would have discovered had they been competent.

"[A] habeas case is not a vehicle for a so-called fishing expedition via discovery, an effort to find evidence to support a claim." Borden, 646 F.3d at 810 n.31. Because Hittson has not alleged any facts to warrant a finding of Strickland prejudice, his first claim is not "substantial."

2.

> Mr. Hittson was Deprived of the Effective Assistance of Counsel Due to His Counsel's Failure to Alert the Trial Court that It Had Forced Them Into a Conflict Regarding the Adequacy of the Waiver Signed by Mr. Hittson During His Evaluation by Dr. Storms.

As explained in the preceding section, Hittson complains that the inquiry into the voluntariness of his "hillbilly" and "asshole" statements to Dr. Storms and the circumstances surrounding his Miranda waiver created a conflict of interests, because his attorneys had some knowledge of "whether or not the waiver was truly

127

a knowing and voluntary one." Second Am. Habeas Pet., ECF no. 94, at 30. According to Hittson, trial counsel abrogated their Sixth Amendment duty by failing to object to this conflict.

The claim is meritless. This type of inquiry into the voluntariness of a defendant's statements and the circumstances surrounding the execution of a Miranda waiver is routine in criminal cases where a statement or confession is admitted. See generally Jackson v. Denno, 378 U.S. 368, 377–81, 84 S. Ct. 1774, 1780–833, 12 L. Ed. 2d 908 (1964). Hittson has laid no foundation for his bare assertion that his attorneys' failure to object to the Jackson–Denno hearing deprived him of his Sixth Amendment right to counsel. He has not cited a scrap of legal authority for his theory that such hearings create a conflict of interest where the attorney has personal knowledge of the circumstances being inquired into. Nor has he identified any professional or ethical standards that would require an attorney to bring such a conflict to the court's attention.

3.

> Mr. Hittson Was Deprived of the Effective Assistance of Counsel by
> His Counsel's Failure to Independently Discover Exculpatory
> Material Suppressed by the State.

Hittson has long claimed, as an element of his Brady claim, that "[t]rial counsel were . . . diligent in attempting to discover the mitigating evidence in the State's possession," Am. Pet. for Writ of Habeas Corpus, ECF no. 45, at 114–15,

128

but he now also seeks to claim that "trial counsel was ineffective for failing to locate and use [Vollmer's psychiatric report] on Mr. Hittson's behalf," Second Am. Habeas Pet., ECF no. 94, at 33–34. We need not attempt to resolve this inconsistency because Hittson has pled no facts to support the ineffective-assistance claim—nor could he, if his representations to this court, the District Court, and the state courts are to be believed.

4.

> Mr. Hittson was Deprived of the Effective Assistance of Counsel Due at Motion for New Trial and Direct Appeal.

> Hittson's last claim does not specify what conduct he is complaining of.

The entirety of the allegations of constitutionally-deficient performance are as follows:

> In his motion for new trial proceeding and direct appeal . . . [c]ounsel failed to fully research, raise, brief and support with evidence the meritorious claims that could and should have been raised based on the errors that occurred during Mr. Hittson's capital trial.

Second Am. Habeas Pet., ECF no. 94, at 35. The allegation of prejudice is equally lacking:

> The attorneys appointed at the motion for new trial and direct appeal stages of Mr. Hittson's capital proceedings failed to effectively litigate strong claims on Mr. Hittson's behalf. Other claims, they abandoned entirely. Not only did these omissions deprived Mr. Tollette [sic] of relief at those levels, but significantly hindered his ability to assert these claims in the current habeas proceedings.

Id. at 36. Such allegations are patently frivolous.

129

Thus, in addition to his failure to establish habeas-counsel ineffectiveness, Hittson has also failed to raise any "substantial" underlying ineffective-assistance claims.  Accordingly, he cannot rely on <u>Martinez</u> to excuse his procedural default.

IX.

For the foregoing reasons, the District Court's grant of habeas relief is REVERSED, and the District Court's denial of habeas relief on all other grounds is AFFIRMED.

SO ORDERED.

CARNES, Chief Judge, concurring:

I fully concur in all of the Court's opinion.  I write separately to respond to the dissent's insistence that the Georgia Superior Court, in rejecting the petitioner's Estelle claims on state collateral review, clearly erred in applying Brecht's harmless-error standard instead of Chapman's more petitioner-friendly standard, and that the asserted error is somehow relevant to whether the petitioner is entitled to federal habeas relief.  See Diss. Opn. at 1–8.  It did not, and it is not.[1]

The central premise of the dissent's position is that circuit precedent, as well as what it sees as the "obvious implications" of the United States Supreme Court's decisions in Brecht and Fry, requires state courts to apply Chapman's harmless-beyond-a-reasonable-doubt standard on collateral review, not just on direct review. Id.  That premise and the conclusions that the dissent draws from it are wrong for a number of reasons.

First, the dissent's focus on the Georgia Superior Court's application of Brecht is inconsistent with our task under AEDPA, which is to evaluate whether

---

[1] The dissenting opinion seems to be of two minds about whether the harmlessness standard that the state collateral trial court applied is relevant to the issue of whether federal habeas relief should be granted.  The first paragraph of that opinion states:  "To be clear, I agree with the Concurrence that the state court's application of the incorrect standard would not be an independent basis for granting habeas relief."  Diss. Opn. at 1.  But the dissenting opinion goes on to state, "I disagree with the Majority's statement that it does not matter whether Georgia's application of Brecht instead of Chapman was unreasonable."  Id. at 8.  And it says, "Fry makes it unclear whether we can grant habeas relief based upon the [state collateral trial] court's error . . . ."  Id. at 7 n.4.  As a precaution, I will respond to the dissenting opinion's second mind, which says that it does matter, as well as to that opinion's assertion that "it was error," id.

131

the highest state court decision addressing the petitioner's claims is incompatible with clearly established Supreme Court precedent.  See 28 U.S.C. § 2254(d)(1); Newland v. Hall, 527 F.3d 1162, 1199 (11th Cir. 2008) ("[T]he highest state court decision reaching the merits of a habeas petitioner's claim is the relevant state court decision.").  As Judge Tjoflat's opinion for the Court in today's case correctly explains, the relevant state court decisions for AEDPA purposes are the Georgia Supreme Court's summary denials of Hittson's applications for a certificate of probable cause (CPC), not the Georgia Superior Court's denials of his two state habeas petitions.  See Maj. Opn. at 35–39, 39 n.25, 41 n.27.  And "[b]ecause we are not reviewing the reasoning announced by the Superior Court," whether the Superior Court's application of Brecht was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent is irrelevant.  See Maj. Opn. at 41 n.27.  Because of AEDPA the only question before us is whether the Georgia Supreme Court had any "reasonable basis" for denying Hittson relief on his Estelle claims.  See Harrington v. Richter, — U.S. —, 131 S.Ct. 770, 784 (2011) ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden [under AEDPA] still must be met by showing there was no reasonable basis for the state court to deny relief.").  We cannot presume from the Georgia Supreme Court's silence that it followed the Superior Court in applying Brecht, especially given that Hittson's application for a

132

CPC argued that the Chapman standard applied under state law.  See Maj. Opn. at 39 n.25, 41 n.27; Gill v. Mecusker, 633 F.3d 1272, 1288–89 (11th Cir. 2011) (examining whether a summary state appellate decision was entitled to AEDPA deference even though the trial court's ruling was "based on potentially flawed reasoning").

Second, our own precedent does not, as the dissent contends, "clearly require[] state courts hearing habeas corpus appeals to use the more petitioner-friendly standard provided in Chapman."  Diss. Opn. at 4.  Citing our decisions in Trepal v. Secretary, Florida Department of Corrections, 684 F.3d 1088 (11th Cir. 2012), and Duest v. Singletary, 997 F.2d 1336 (11th Cir. 1993), the dissent asserts that "we have unambiguously required that state collateral courts apply Chapman in reviewing . . . federal constitutional claims."  Diss. Opn. at 3.  That is wrong, unless you count ambiguous dicta as an unambiguous holding.

In Trepal we explicitly recognized that "Chapman was a direct-appeal case" and that "Brecht determined that [Chapman's] harmless error standard did not apply on collateral review."  684 F.3d at 1111.  Although we said in a footnote that Brecht "does not apply to state courts' review of their own convictions," that statement was founded upon the observation that, as a matter of practice, "Florida courts apply the more petitioner-friendly Chapman standard of whether the constitutional error is 'harmless beyond a reasonable doubt.'"  Id. at 1112 n.27

133

(quoting Pittman v. State, 90 So. 3d 794, 811 (Fla. 2011)).  In Trepal we had no occasion to decide, and did not purport to decide, whether state courts are constitutionally required to apply Chapman on collateral review because the state collateral courts in that case had rejected the petitioner's claims on the merits, not on grounds of harmlessness; they did not apply either the Chapman or the Brecht standard.  See id. at 1104–06.  The most that can be said about the dicta in our Trepal opinion is that it recognized that state courts are required to apply Chapman on direct review and that they usually do apply that same standard on collateral review.  We did not say, even in dicta, that they must do so.

In any event, our dissenting colleague fails to recognize that whatever one may attempt to read into one of our opinions, or indeed whatever they may say, a decision can never hold anything beyond the facts of the case before it; all else is dicta, which is not binding on anyone for any purpose.  See Edwards v. Prime, Inc., 602 F.3d 1276, 1298 (11th Cir. 2010) ("We have pointed out many times that regardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case.  All statements that go beyond the facts of the case . . . are dicta.  And dicta is not binding on anyone for any purpose.") (citations omitted); Pretka v. Kolter City Plaza II, Inc., 608 F.3d 744, 762 (11th Cir. 2010) ("We are not required to follow dicta in our own prior decisions.  Nor for that matter is anyone else.") (citation omitted); Watts v. BellSouth Telecomms., Inc., 316 F.3d

134

1203, 1207 (11th Cir. 2003) ("Whatever their opinions say, judicial decisions cannot make law beyond the facts of the cases in which those decisions are announced."); United States v. Aguillard, 217 F.3d 1319, 1321 (11th Cir. 2000) ("The holdings of a prior decision can reach only as far as the facts and circumstances presented to the Court in the case which produced that decision.") (quotation marks omitted); Browning v. AT&T Paradyne, 120 F.3d 222, 225 n.7 (11th Cir. 1997) ("Since this statement was not part of any holding in the case, it is dicta and we are not bound by it.").

Our decision in Duest is no different. In that case we merely acknowledged that Brecht's harmless-error standard for federal habeas review is identical to "the harmless-error standard federal appellate courts use on direct review as to nonconstitutional error," and then vaguely noted that Chapman applies "in all other situations." Duest, 997 F.2d at 1338 & n.2. In context, the most that can be said about our statements in Duest is that they recognize that Chapman applies to constitutional errors reviewed on direct appeal, whether in state or federal court. Like Trepal, our Duest decision did not address, did not purport to address, and could not have held anything about whether Chapman must be applied in state collateral proceedings, because the state collateral courts in that case had actually applied Chapman. Id. at 1339 n.4. Neither Trepal nor Duest nor any other

135

decision issued by this circuit has held, or had occasion to hold, that state courts must apply Chapman not only on direct review, but also on collateral review.

And even if there were an actual holding to that effect in one of our decisions, it would still be irrelevant under AEDPA, which forecloses federal habeas relief unless the relevant state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1) (emphasis added).  By relying on our precedent, our dissenting colleague forgets what the Supreme Court has repeatedly told us, which is that the only thing that can clearly establish federal law for AEDPA purposes is a holding of the United States Supreme Court, not dicta, and certainly not the holdings of lower federal courts. See Parker v. Matthews, 132 S.Ct. 2148, 2155 (2012) (explaining that the decisions of federal appeals courts "cannot form the basis for habeas relief under AEDPA" because they do "not constitute clearly established Federal law, as determined by the Supreme Court") (quotation marks omitted); Marshall v. Rodgers, 133 S.Ct. 1446, 1450 (2013) ("The Court of Appeals' contrary conclusion rested in part on the mistaken belief that circuit precedent may be used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced."); see also White v. Woodall, 134 S.Ct. 1697, 1702 n.2 (2014); Renico v. Lett, 559 U.S. 766, 778–79, 130 S.Ct. 1855, 1865–66 (2010);

136

Dombrowski v. Mingo, 543 F.3d 1270, 1274 (11th Cir. 2008) ("We have held that the 'clearly established law' requirement of § 2254(d)(1) does not include the law of the lower federal courts."); Putnam v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001) ("Clearly established federal law is not the case law of the lower federal courts, including this Court.").

The third reason that the premise and conclusion of the dissenting opinion is wrong is that the Supreme Court's decisions in Brecht and Fry do not imply, let alone clearly hold (and thereby establish for AEDPA purposes), that state courts are required to apply Chapman's harmless-error standard on collateral review. To support its belief that they do, the dissenting opinion clips language from those two decisions, disregards the context of that language, and omits most of the limiting references to direct review. See Diss. Opn. at 6–7. Brecht and Fry both underscored that Chapman was decided on direct review and that it requires states to apply its harmless-beyond-a-reasonable-doubt standard on direct review. See Brecht, 507 U.S. at 630, 636, 113 S.Ct. at 1718, 1721 (explaining that "Chapman reached this Court on direct review" and set the standard that state courts must "engage in on direct review") (emphasis added); Fry, 551 U.S. at 116, 127 S.Ct. at 2325 ("In Chapman, . . . a case that reached this Court on direct review of a state-court criminal judgment, we held that a federal constitutional error can be considered harmless only if a court is able to declare a belief that it was

137

harmless beyond a reasonable doubt.") (quotation marks omitted).  In <u>Brecht</u>, the Supreme Court declined to extend <u>Chapman</u>'s standard to federal habeas review, broadly concluding that a "substantial and injurious effect" standard was "better tailored to the nature and purpose of <u>collateral review</u> than the <u>Chapman</u> standard." 507 U.S. at 623, 113 S.Ct. at 1714 (emphasis added).

One of the primary reasons the <u>Brecht</u> Court gave for refusing to extend <u>Chapman</u> to federal collateral review — a reason equally applicable to state collateral review — is the fundamental difference between direct review, which "is the principal avenue for challenging a conviction," and collateral review, where the state has an "interest in the finality of convictions that have survived direct review within the state court system."  <u>Id.</u> at 633–35, 113 S.Ct. at 1719–20; <u>see also</u> <u>Mansfield v. Sec'y, Dep't of Corr.</u>, 679 F.3d 1301, 1307 (11th Cir. 2012) ("The Supreme Court emphasized in <u>Brecht</u> that 'collateral review is different from direct review,' and, therefore, that 'an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment.'") (quoting <u>Brecht</u>, 507 U.S. at 633–34, 113 S.Ct. at 1719–20).  Nothing in <u>Brecht</u> implies, let alone clearly establishes, that state courts must apply <u>Chapman</u> on collateral review.  If anything, <u>Brecht</u>'s principal rationale — that "collateral review is different from direct review" and that the "substantial and injurious effect" standard is "better tailored to the nature and purpose of collateral review than the <u>Chapman</u> standard"

138

— implies that state courts, like federal courts, are not bound to apply the Chapman standard when conducting collateral review.

The Supreme Court's Fry decision took Brecht one step further away from the position of the dissenting opinion in the present case. Fry held that federal habeas courts must apply the "substantial and injurious effect" standard to evaluate constitutional errors regardless of whether the state courts recognized the error and reviewed it for harmlessness under the Chapman standard. Fry, 551 U.S. at 121–22, 127 S.Ct. at 2328. Fry did not imply, much less definitively decide, that state courts must apply Chapman on collateral review. Indeed, it had no occasion to address that question because the relevant state court decision in that case — which notably failed to apply Chapman — was issued on direct appeal, not on collateral review. See id. at 115, 166 n.1, 127 S.Ct. at 2324, 2325 n.1. Thus, when the Supreme Court in Fry noted that "state courts are required to evaluate constitutional error under Chapman," it was simply reiterating the well-worn principle that Chapman sets forth the appropriate harmless-error standard on direct appeal, which is what that case was. Id. at 118, 127 S.Ct. at 2326. That Brecht, Fry, and circuit precedent establish that regardless of what the state courts do, federal habeas courts must apply Brecht's harmless-error standard does not imply, as the dissent suggests, that Chapman is the only appropriate standard on state collateral review. See Diss. Op. at 5–6; cf. Brooks v. Kyler, 204 F.3d 102, 108 (3d

139

Cir. 2000) ("[D]rawing instruction from Supreme Court passages through the use of the negative pregnant is risky and unsatisfactory."). It implies nothing at all about the proper harmlessness standard for state collateral review.

From its unfounded premise that state collateral courts are categorically required to apply Chapman instead of Brecht, the dissent suggests that the harmless-error standard employed by a state collateral court may affect whether a petitioner is entitled to federal habeas review. See Diss. Opn. at 7–8. Setting aside the flaws in its underlying premise, which have already been discussed, the dissent's suggestion cannot be squared with the Supreme Court's decision in Fry. In that case a state appellate court had rejected a petitioner's constitutional claim on direct appeal, concluding that the asserted error resulted in "no possible prejudice." Fry, 551 U.S. at 115, 127 S.Ct. at 2324 (quotation marks omitted). The state court, however, "did not specify which harmless-error standard it was applying," and the Supreme Court assumed for the sake of argument that the state court "did not determine the harmlessness of the error under the Chapman standard," as it was required to do on direct appeal. Id. at 115, 116 n.1, 127 S.Ct. at 2324, 2325 n.1. Even with that assumption, the Supreme Court concluded that the petitioner in Fry was not entitled to federal habeas relief because the error was harmless under the Brecht standard. Id. at 116, 122, 127 S.Ct. at 2324, 2328. The Fry Court held that a federal habeas court must apply

140

Brecht "whether or not the state appellate court recognized the [constitutional] error and reviewed it for harmlessness under the harmless beyond a reasonable doubt standard set forth in Chapman." Id. at 121–22, 127 S.Ct. at 2328 (quotation marks omitted). And it explained that a petitioner, even one who can demonstrate that the state court's "harmlessness determination . . . was unreasonable," is not entitled to federal habeas relief unless he "also satisf[ies] Brecht's standard." Id. at 119, 127 S.Ct. at 2326–27 (emphasis omitted); see also Mansfield, 679 F.3d at 1308 ("[A] federal court may deny habeas relief based solely on a determination that the constitutional error is harmless under the Brecht standard.").

In other words, even if a state court failed to recognize a constitutional error, failed to review it for harmlessness, or failed to apply the correct harmless-error standard, the Supreme Court's Fry decision requires that federal habeas relief must still be denied if the error was harmless under Brecht's "substantial and injurious effect" standard. We have recognized exactly that. See Hodges v. Att'y Gen., State of Fla., 506 F.3d 1337, 1342–43 (11th Cir. 2007) ("[I]f the state court did not apply the correct harmless error standard, or even if it did not recognize that there was error, federal habeas relief is still due to be denied if the constitutional error was harmless [under Brecht].").

The dissenting opinion's insistence that Fry, despite its clear language, is unclear on this point rests on the spurious notion that Fry "assumes that state

141

collateral courts will properly apply the <u>Chapman</u> standard." Diss. Opn. at 7 n.4. <u>Fry</u> assumed no such thing. To the contrary, it explicitly assumed just the opposite. The Court plainly stated that it was assuming that the state appellate court in that case had not applied the correct harmlessness standard. <u>Fry</u>, 551 U.S. at 116 n.1, 127 S.Ct. at 2325 n.1 ("We also assume that the state appellate court did not determine the harmlessness of the error under the <u>Chapman</u> standard . . . ."). Judge Tjoflat's opinion for this Court is absolutely right when it says that Hittson would not be entitled to federal habeas relief under <u>Brecht</u>'s harmless-error standard even if we assumed both that the Georgia Supreme Court had applied <u>Brecht</u> and that that application was contrary to clearly established Supreme Court precedent. That is what <u>Fry</u> says and holds. The dissenting opinion errs in suggesting otherwise.

I have put off until the end the most noteworthy of the dissenting opinion's errors, one that would have the most profound and far reaching impact if it were the law, which thankfully it is not. The error is embodied in that opinion's attitude about the relationship between this Court and the state courts. The dissenting opinion takes the position that we have the authority and the duty to lecture state courts about federal law and to admonish them to follow the law, that we are their teachers, and that the state courts in this circuit are bound to follow our views. In footnote 4, for example, the dissenting opinion says that regardless of whether the

142

state collateral trial court's application of the <u>Brecht</u> standard is a basis for granting federal habeas relief, "we should be clear that it was error, that it should not be repeated, and that it matters." Diss. Opn. at 7 n.4. Instead, what we should be clear about is that outside of what is necessary to decide if federal habeas relief is due to be granted, it is not the role of inferior federal courts, of which we are one, to sit in judgment of state courts on issues of federal law, and we should not arrogate to ourselves the role of lecturing them that one of their rulings is an error of federal law that "should not be repeated." The Supreme Court alone, and not any inferior federal court, may do that. We have no more right to lecture state courts about federal law than they have to lecture us about it.

The Supreme Court has rejected and disparaged as "remarkable" a passage from a Ninth Circuit opinion saying that state courts are bound to follow rulings of the federal court of appeals in the circuit in which they are located. <u>Arizonans for Official English v. Arizona</u>, 520 U.S. 43, 58 n.11, 117 S.Ct. 1055, 1064 n.11 (1997). In making it clear that the Ninth Circuit's view was wrong, the Supreme Court cited with favor its own decision in <u>ASARCO Inc. v. Kadish</u>, 490 U.S. 605, 617, 109 S.Ct. 2037, 2045 (1989), which instructed federal courts that "state courts . . . possess the authority, absent a provision for exclusive federal jurisdiction, to render binding judicial decisions that rest on their own interpretations of federal law." <u>Id.</u> The Court also cited with favor Justice Thomas' concurring opinion in

143

Lockhart v. Fretwell, 506 U.S. 364, 375–376, 113 S.Ct. 838, 845–846 (1993), for the proposition that the "Supremacy Clause does not require state courts to follow rulings by federal courts of appeals on questions of federal law." Id.  As Justice Thomas explained in that opinion:  "The Supremacy Clause demands that state law yield to federal law, but neither federal supremacy nor any other principle of federal law requires that a state court's interpretation of federal law give way to a (lower) federal court's interpretation.  In our federal system, a state trial court's interpretation of federal law is no less authoritative than that of the federal court of appeals in whose circuit the trial court is located."  Lockhart, 506 U.S. at 376, 113 S.Ct. at 846.

We have reiterated that same core principle of federalism.  See Casale v. Tillman,  558 F.3d 1258, 1260 (11th Cir. 2009) (describing as a "well settled" principle of federalism that "a state court's interpretation of federal law is no less authoritative than that of the corresponding federal court of appeals") (brackets and quotation marks omitted); Glassroth v. Moore, 335 F.3d 1282, 1302 n.6 (11th Cir. 2003) ("[S]tate courts when acting judicially, which they do when deciding cases brought before them by litigants, are not bound to agree with or apply the decisions of federal district courts and courts of appeal."); see also Powell v. Powell, 80 F.3d 464, 467 (11th Cir. 1996) (referring to "the dual dignity of state and federal court

144

decisions interpreting federal law" as going "to the heart of our system of

federalism").

WILSON, Circuit Judge, dissenting:

The district court correctly decided this case by concluding that the violation of Hittson's constitutional rights had a "substantial and injurious effect or influence" on the jury's determination to sentence him to death. *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S. Ct. 1710, 1722 (1993). In addition, I am unable to join the Majority's disregard of our precedent inherent in its conclusion that it does not matter whether a state court, sitting in collateral review, applies either the harmless error standard articulated in *Brecht*, or the more petitioner-friendly harmless error standard provided by *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967). To be clear, I agree with the Concurrence that the state court's application of the incorrect standard would not be an independent basis for granting habeas relief. *See Fry v. Pliler*, 551 U.S. 112, 121–22, 127 S. Ct. 2321, 2328 (2007) (holding that federal habeas courts must apply the *Brecht* standard even where the state court did not recognize a constitutional error). However, the fact that we would not grant habeas on that basis alone does not mean that state courts are free to apply *Brecht* instead of *Chapman*, or as in *Fry*, no review at all, when a constitutional error was committed. As our court has said three times, state courts are supposed to apply *Chapman*, not *Brecht*, even on collateral review. Here, my concurring colleague goes to great lengths to characterize what we have said as dicta. In so doing, the Concurrence disregards binding precedent for

146

purposes that are not even relevant to the resolution of this case, given our conclusion that *Fry* precludes use from granting relief based solely on a state collateral court's application of the wrong harmless error standard.  But we have made clear that, even though we cannot grant habeas relief on this basis, it is nevertheless erroneous for state courts to apply *Brecht* not *Chapman* on collateral review.  To the extent that the Majority suggests otherwise, I cannot endorse that opinion, which essentially tells state courts that because we cannot grant relief when they apply the wrong standard, they are free, despite our precedent, to apply the wrong standard at will.

The district court concluded that Hittson was entitled to habeas relief, holding that the trial court's allowance of Dr. Storms's testimony denied Hittson his Fifth and Sixth Amendment rights under *Estelle v. Smith*, 451 U.S. 454, 101 S. Ct. 1866 (1981), and that the testimony had a "substantial and injurious effect" on the jury's death sentence and was therefore not harmless under the *Brecht* standard. 507 U.S. at 637, 113 S. Ct. at 1722.  In Hittson's case, the jury imposed the death penalty after finding one aggravating statutory circumstance: that the murder was "outrageously or wantonly vile, horrible, or inhuman in that it involved depravity of mind." *Hittson v. Humphrey*, No. 5:01-cv-384, 2012 WL 5497808, at *40 (M.D. Ga. November 13, 2012).  As the district court notes, Dr. Storms's testimony was the only evidence that, months after the crime, Hittson possessed a

147

corrupt or depraved mind. *Id.* Because Georgia law requires a jury to unanimously find at least one statutory aggravating factor to return a death sentence, "habeas relief is warranted in this case if we believe even one of the jurors who voted in favor of the death penalty likely was substantially influenced" by the error. *Duest v. Singletary*, 997 F.2d 1336, 1339 (11th Cir. 1993) (per curiam). Thus, contrary to the Majority, I agree with the district court that we cannot conclude with fair assurance that the erroneous admission of Dr. Storms's testimony in the context of the trial as a whole did not substantially sway the jury. The testimony was admitted in violation of clearly established Supreme Court precedent. *See Estelle*, 451 U.S. at 471, 101 S. Ct. at 1877. The constitutional violation was harmful under the *Brecht* standard, and therefore Hittson is entitled to habeas relief.

Further, the district court correctly noted that the state collateral court erred applying the *Brecht* harmless error standard rather than the *Chapman* harmless error standard. Although the Majority concedes that the Georgia Superior Court's application of the *Brecht* standard to Hittson's *Estelle* claims was "seemingly anomalous" and that Georgia habeas courts typically apply the more petitioner-friendly standard from *Chapman*, it concludes that state courts are only required to

148

use *Chapman* harmless error standard on direct review.[1]  Also, the Majority

ultimately finds the state habeas court's choice of a standard of review irrelevant

because, in any event, the federal court will apply the *Brecht* standard.

However, our precedent clearly requires state courts hearing habeas corpus

appeals to use the more petitioner-friendly standard provided in *Chapman*.  Before

today's case, no state appellate court in this circuit, as far as I can find, has applied

the *Brecht* standard to review the lower state court's constitutional error.  This is

expected, as we have unambiguously required that state collateral courts apply

*Chapman* in reviewing their federal constitutional claims.  *See Trepal v. Sec'y, Fla.*

*Dep't of Corr.*, 684 F.3d 1088, 1112 n.27 (11th Cir. 2012), *cert. denied*, 133 S. Ct.

1598 (2013); *Duest*, 997 F.2d at 1338 & n.2.  In *Trepal*, we said:

> We emphasize that the *Brecht* standard is a harmless error test that
> applies to federal habeas review of state convictions.  *Brecht*, 507
> U.S. at 634–38, 113 S. Ct. at 1720–22; [*Ventura v. Atty. Gen., Fla.*,
> 419 F.3d 1269, 1279 n.4 (11th Cir. 2005)].  **It does not apply to state**
> **courts' review of their own convictions.  Instead, the Florida**
> **courts apply the more petitioner-friendly *Chapman* standard of**
> **whether the constitutional error is "harmless beyond a reasonable**
> **doubt."**

684 F.3d at 1112 n.27 (emphasis added).[2]  And in *Duest*, we said again, "The

harmless-error standard for constitutional violations in all other situations remains

---

[1] The Majority places their analysis of the appropriate standard of review for state
collateral courts assessing constitutional errors in footnote 26.

the longstanding test of *Chapman v. California*: whether the State has proved the error was harmless beyond a reasonable doubt." 997 F.2d at 1338 n.2 (citation omitted). This guidance to the state court is not vague in any way, as my concurring colleague suggests. We clearly stated that the appropriate standard in "all other situations," obviously including collateral review, is the "longstanding test of *Chapman v. California*." *Id.* Most recently in *Rodriguez v. Sec'y of Fla.*, No. 11-13273, __ F.3d __ , (11th Cir. June 30, 2014), we reiterated that *Brecht* is only the appropriate harmless error standard for federal habeas review, citing our decision in *Trepal. See Rodriguez*, p. 53, n.44 ("Because we consider the *Brecht* question *in the first instance on federal habeas review*, there is no state court *Brecht* actual-prejudice finding to review or to which we should defer." (emphasis added) (citing *Trepal*, 684 F.3d at 1112)). Our precedent has routinely advised state courts that while the *Brecht* standard applies to assess constitutional error in federal court, *Chapman* is the appropriate standard on state collateral review. Each of my colleagues in today's Majority was on the panel in either *Trepal* or *Duest*,

---

[2] I disagree with my concurring colleague that the most that can be said of *Trepal* is that we said that state courts "usually do apply [*Chapman*] standard on collateral review." Concurring Op., p. 4.

150

and both were on *Rodriguez*, joining opinions making it clear that state courts are expected to use *Chapman* —not *Brecht—*to analyze constitutional errors.[3]

In addition to our own precedent, the Supreme Court in *Brecht* itself indicated that state courts are required to apply the more petitioner-friendly *Chapman* analysis of whether the constitutional error is "harmless beyond a reasonable doubt." *See Brecht*, 507 U.S. at 636, 113 S. Ct. at 1721 (noting the "harmless-error review that *Chapman* requires" of state courts). In *Brecht*, the Supreme Court explained that it would not make sense for federal courts to apply *Chapman* in reviewing state errors, after the state courts had themselves used that standard. *Id.* ("[I]t scarcely seems logical to require federal habeas courts to engage in the identical approach to harmless-error review that *Chapman* requires state courts to engage in on direct review."). Indeed, the Supreme Court acknowledged that interests in comity and federalism support a standard, such as *Brecht*, which is less petitioner-friendly than *Chapman*, for federal collateral review of state constitutional errors. *Id*. That federal habeas courts apply a more deferential harmless error standard does not mean that states are free to do the same: it only means that we cannot grant relief for less egregious constitutional errors in state courts. To be clear, however, applying *Brecht* in state courts is error.

---

[3] The Majority's analysis of this issue, which appears only in footnote 26, does not even cite this binding Circuit precedent.

More recently, the Supreme Court implied the mandatory nature of *Chapman* review for state courts analyzing the effects of constitutional error in *Fry v. Pliler*. 551 U.S. at 117–18, 127 S. Ct. at 2326. In *Fry,* while addressing the standard under which a federal court must assess the prejudicial impact of a constitutional error, the Supreme Court repeatedly acknowledged that state courts "are required to" apply the *Chapman* standard in reviewing their own constitutional errors. *See, e.g.*, *Fry*, 551 U.S. at 118, 127 S. Ct. at 2326 ("To say (a) that since state courts are *required* to evaluate constitutional error under *Chapman* it makes no sense to establish *Chapman* as the standard for federal habeas review is not at all to say (b) that whenever a state court fails in its responsibility to apply *Chapman* the federal habeas standard must change."). The Supreme Court ultimately held that *Brecht*'s applicability to federal review of state constitutional errors is not contingent on whether or not the state appellate court recognized the constitutional error and "reached the *Chapman* question," thus implicitly recognizing that *Chapman* continues to be the proper standard for a state court's review of its own constitutional errors. *Id.*, 127 S. Ct. at 2326. *Fry* certainly did not tell state courts that the Constitution does not require them to apply *Chapman* when they recognize and evaluate constitutional errors. *Id.* at 120–22, 127 S. Ct. at 2327–28. Even if we disregard the obvious implications of *Brecht* and *Fry,* in addition to our court's clear precedent, neither Respondent nor

152

the Majority has pointed us to any authority indicating that states are free to use *Brecht* on initial collateral review in habeas corpus proceedings.[4]  Indeed, if there was any doubt that *Chapman* was meant to apply as the harmless error standard on state collateral review, our precedent clarifies the expectation that *Chapman* does apply.

Finally, I disagree with the Majority's statement that it does not matter whether Georgia's application of *Brecht* instead of *Chapman* was unreasonable, because we will just apply *Brecht* de novo anyway.  If we apply *Brecht* de novo without first affording the State an opportunity to apply *Chapman,* what is the point—why have we been telling the states all these years to apply *Chapman* and not *Brecht*?  The state court here, unlike the state court in *Fry*, found that the lower court had committed constitutional error and applied a standard that was more difficult for Hittson to meet than the standard precedent required the court to apply.  That the error was not, in the Majority's view, harmful based on the *Brecht*

---

[4] I disagree that *Fry* supports the Majority's conclusion that it does not matter what standard a state collateral court applies in assessing constitutional error.  In that decision, the Supreme Court held that a federal court must assess the prejudicial impact of a state court's constitutional error under *Brecht's* "substantial and injurious effect" standard, not under *Chapman's* "harmless beyond reasonable doubt" standard, regardless of whether the state court has recognized the error and found it harmless under the *Chapman* standard.  *Fry*, 551 U.S. at 121, 127 S. Ct. at 2328.  Thus, *Fry* assumes that state collateral courts will properly apply the *Chapman* standard.  That the state court failed to do as required matters a great deal, especially because the error deprived Hittson of his opportunity to have the petitioner-friendly standard applied to him.  *Fry* makes it unclear whether we can grant habeas relief based upon the court's error, but again, we should be clear that it was error, that it should not be repeated, and that it matters.

153

standard, simply does not mean the state court did not err in applying *Brecht* rather than *Chapman*.

Here, the district court properly applied *Brecht* and concluded that the violation of Hittson's constitutional rights had a "substantial and injurious effect or influence" on the jury's determination to sentence him to death. *Brecht*, 507 U.S. at 637, 113 S. Ct. at 1722. Thus, Hittson probably would have achieved habeas relief at the state court level, had the state court applied the proper, *less onerous* standard that constitutional violations require reversal unless they were "harmless beyond a reasonable doubt," *Chapman*, 386 U.S. at 24, 87 S. Ct. at 828. The State insists that the record as a whole and the horrific details of Hittson's crime are so overwhelming that Dr. Storms's unconstitutional testimony, rebutting the minimal testimony of remorse Hittson provided, did not make a difference in the outcome of the trial. Like the district court I disagree, and find that the violation of Hittson's constitutional rights was substantial and injurious. *Brecht*, 507 U.S. at 638; 113 S. Ct. at 1722. Also, according to our precedent and the clear implication of the Supreme Court, Hittson was still entitled to have his Fifth Amendment claim considered by the State of Georgia under the *Chapman* analysis before our review and he was deprived of that entitlement.

Accordingly, I respectfully dissent.

154